*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 08a0146a.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

TIMOTHY MORRISON et al.,
        *Plaintiffs-Appellants (06-5380; 06-5406)/*
                      *Cross-Appellees,*

    *v.*

BOARD OF EDUCATION OF BOYD COUNTY,
                *Defendant-Appellee,*

WILLIAM CARTER et al.,
       *Intervenors-Defendants-Appellees/*
         *Cross-Appellants (06-5407).*

Nos. 06-5380/5406/5407

———————————

Appeal from the United States District Court
for the Eastern District of Kentucky at Ashland.
No. 05-00038—David L. Bunning, District Judge.

Argued: July 25, 2007

Decided and Filed: April 9, 2008

Before: MOORE and COOK, Circuit Judges; and ADAMS, District Judge.[*]

———————————

[*] The Honorable John R. Adams, United States District Judge for the Northern District of Ohio, sitting by designation.

_____

**COUNSEL**

**ARGUED:** Joel L. Oster, ALLIANCE DEFENSE FUND, Leawood, Kansas, for Plaintiffs. Winter R. Huff, LAW OFFICES OF JOHN G. PRATHER, Somerset, Kentucky, for Defendants. Sharon McGowan, AMERICAN CIVIL LIBERTIES UNION, New York, New York, for Intervenors. **ON BRIEF:** Joel L. Oster, Kevin H. Theriot, ALLIANCE DEFENSE FUND, Leawood, Kansas, Benjamin W. Bull, Gary McCaleb, ALLIANCE DEFENSE FUND, Scottsdale, Arizona, for Plaintiffs. Winter R. Huff, LAW OFFICES OF JOHN G. PRATHER, Somerset, Kentucky, Kimberly S. McCann, VanANTWERP, MONGE, JONES & EDWARDS, LLP, Ashland, Kentucky, for Defendants. Sharon McGowan, Kenneth Y. Choe, AMERICAN CIVIL LIBERTIES UNION, New York, New York, David A. Friedman, AMERICAN CIVIL LIBERTIES UNION OF KENTUCKY, Louisville, Kentucky, for Intervenors.

COOK, J., delivered the opinion of the court, in which ADAMS, D. J., joined. MOORE, J. (pp. 9-21), delivered a separate dissenting opinion.

_____

**AMENDED OPINION**
_____

COOK, Circuit Judge. This panel heard arguments in the matter before us on July 25, 2007, after which we filed an opinion, *Morrison v. Board of Education of Boyd County*, 507 F.3d 494 (6th Cir. 2007), reversing the judgment of the district court and remanding for further proceedings. Subsequently, the Board of Education of Boyd County (the "Board") filed a petition for rehearing en banc. Review of the briefs and record counsels us to reconsider our previous holding, and as a result we vacate and amend Sections III and IV of the prior opinion. We now affirm the district court's decision and set forth our opinion, as amended, below.

In this appeal, Timothy Morrison ("Morrison") challenges the district court's grant of summary judgment in favor of the Board. Morrison is a student at Boyd County High School ("BCHS"). He is a Christian who believes that homosexuality is a sin. He further believes that part of his responsibility as a Christian is to tell others when their conduct does not comport with his understanding of Christian morality. During the 2004–05 academic year, BCHS had a written policy prohibiting students from making stigmatizing or insulting comments regarding another student's sexual orientation. Wary of potential punishment, Morrison remained silent with respect to his personal beliefs, but challenged in federal court the Board's right to stifle his speech.

After Morrison filed this lawsuit, the Board changed the BCHS policy, but Morrison's litigation did not end. We must now decide whether Morrison's claim for nominal damages premised upon a "chill" on his speech during the 2004–05 school year presents a justiciable controversy. We conclude that it does not, and accordingly AFFIRM the district court's grant of summary judgment to the Board.

I. BACKGROUND

A.    Factual Background

In 2002, some students at BCHS petitioned to start a chapter of the Gay Straight Alliance ("GSA"). *Boyd County High Sch. Gay Straight Alliance v. Bd. of Educ. of Boyd County*, 258 F. Supp. 2d 667, 670 (E.D. Ky. 2003). Their efforts were met with hostility, which was not very surprising given BCHS students' history of intolerance toward homosexuality. *Id.* at 670–74. To

quell the hostility, within two months of approving the GSA, the school banned the GSA, as well as purported to ban all other student organizations for the 2002–03 school year. *Id.* at 675.

In response, a group of students who had attempted to spearhead the GSA chapter and their parents sued the school district in federal court. After the district court issued a preliminary injunction requiring the school board to give the GSA chapter equal access to that afforded other student groups, *id.* at 693, the suit ended in a consent decree. One provision in the consent decree required the school district to adopt policies prohibiting harassment on the basis of actual or perceived sexual orientation, and to provide mandatory anti-harassment training to all students.

Prior to the 2004–05 school year, in attempting to comply with the consent decree, the school district adopted Policy 09.42811 as the district-wide anti-harassment policy. Policy 09.42811 prohibited "Harassment/Discrimination," which it defined as:

> unlawful behavior based on race, color, national origin, age, religion, sex[,] actual or perceived sexual orientation or gender identity, or disability that is sufficiently severe, pervasive, or objectively offensive that it adversely affects a student's education or creates a hostile or abusive educational environment.

> The provisions in this policy shall not be interpreted as applying to speech otherwise protected under the state or federal constitutions where the speech does not otherwise materially or substantially disrupt the educational process . . . .

Joint Appendix ("J.A.") at 120. BCHS's 2004–05 Code of Conduct repeated the first paragraph of Policy 09.42811, J.A. at 270 (BCHS Code at 3), but later stated:

> Harassment/discrimination is intimidation by threats of or actual physical violence; the creation by whatever means, of a climate of hostility or intimidation, or the use of language, conduct, or symbols in such manner as to be commonly understood to convey hatred, contempt, or prejudice or to have the effect of insulting or stigmatizing an individual.

J.A. at 277 (BCHS Code at 16).

Additionally, the school district created two training videos—one for Boyd County Middle School ("BCMS") and one for BCHS—to fulfill the anti-harassment training provisions of the consent decree. As relevant here, the high school training video included a lengthy discussion of the ills of bullying and name-calling. The participants included a BCHS social studies teacher,[1] some students, an "ADL Facilitator,"[2] and a clinical psychologist. Additionally, the BCHS training video contained a passage discussing sexual orientation. Near the end of this passage, the clinical psychologist stated:

> We all get self-centered and start to think that our way is the right way and our way is the correct way. We all want to believe that we have evidence that our way is the correct way . . . .

> So . . . no matter where you go, no matter what you do, no matter who you meet, you are going to find people that you don't like. You're going to find people that you

---

[1] This teacher was also the "compliance coordinator" under the consent decree.

[2] Although the record is unclear, it appears that "ADL" stands for "Anti-Defamation League."

> disagree with. You're going to find people that you don't like the way they act. It can't be avoided, not, not anywhere in the world, it can't be avoided. You're going to find people that you believe are absolutely wrong. You're going to think[, "W]hat are they thinking? That, that is so wrong, it[']s obvious to everybody[." B]ut not to them. Because they believe you are wrong. You can't avoid meeting people that you believe are wrong. But here is the kicker, just because you believe, just because you don't like them, just because you disagree with them, just because you believe they are wrong, whole heartedly, absolutely, they are wrong. *Just because you believe that does not give you permission to say anything about it.* It doesn't require that you do anything. You just respect, you just exist, you continue, you leave it alone. *There is not permission for you to point it out to them.*

J.A. at 229 (BCHS Training Video Tr. at 29) (emphases added).

The new policies and the mandatory training sparked further acrimony in Boyd County. This time, some parents feared that the training would discourage, and the policies would prohibit, their children from speaking about their religious beliefs regarding homosexuality. Some parents withheld their children from the mandatory training. Eventually, a group of parents and students sued.

**B.     Procedural Background**

On February 15, 2005, a group of plaintiffs[3] filed a complaint in the United States District Court for the Eastern District of Kentucky. They named the Board as the sole defendant and pursued claims under 42 U.S.C. § 1983 for violations of various constitutional rights, specifically, their rights to free speech (first cause of action), due process (second cause of action), equal protection (third cause of action), and free exercise of religion (fourth cause of action). The crux of the plaintiffs' complaint is that the speech codes in effect during the 2004–05 school year prevented students in Boyd County from voicing their convictions that homosexuality is sinful, and the speech codes and training together undermined their ability to practice their Christian faith. For these asserted violations, the plaintiffs sought declaratory relief, injunctive relief, actual damages, nominal damages, costs, and attorney fees.

On April 18, 2005, the district court permitted the plaintiffs from the earlier action to intervene. The intervenors filed their Answer in Intervention that day, denying that the plaintiffs suffered any constitutional violations.[4]

In August 2005, the Board revised its policy, as well as the BCMS and BCHS student codes of conduct. Under the revised codes, anti-homosexual speech would not be prohibited unless it was "sufficiently severe or pervasive that it adversely affects a student's education or creates a climate of hostility or intimidation for that student, both from the perspective of an objective educator and from the perspective of the student at whom the harassment is directed." J.A. at 655 (2005–06 BCHS Code of Conduct at 40); *accord* J.A. at 642 (2005–06 BCMS Discipline Code at 16). Additionally, the BCHS Code of Conduct stated, "The civil exchange of opinions or debate does not constitute harassment. Students may not, however, engage in behavior that interferes with the rights

---

[3]The only plaintiff whose claim is relevant at this point of the litigation is Morrison. At the time the complaint was filed, Morrison was a student at BCHS. The other plaintiffs are his parents Timothy and Mary Morrison, Brian Nolen, and Debora Jones. Both Nolen and Jones are parents of students who attended BCMS at some time relevant to this case.

[4]Later, the intervenors changed their position and argued that the 2004–05 BCHS speech code was unconstitutional.

of another student or materially and substantially disrupts the educational process." J.A. at 655 (2005–06 BCHS Code of Conduct at 40).

After these revisions, the parties filed cross-motions for summary judgment. On February 17, 2006, the district court issued its opinion and judgment granting the Board's motion and denying both the plaintiffs' and the intervenors' motions. Noting the changes made to the initially challenged policies, the district court indicated that it was "not inclined to adjudge the constitutionality of policies no longer in effect," and rejected all of the plaintiffs' challenges to the written policies on this basis. J.A. at 672 (Dist. Ct. Mem. Op. at 7). Additionally, the district court determined that Plaintiffs' claim for damages failed because "Plaintiffs were unable to specify the measure and amount of their alleged damages." J.A. at 680 (Dist. Ct. Mem. Op. at 15). The district court further stated that "even their request for nominal damages remains unsupported by any factual allegations," and that "Plaintiffs have made no specific plea" for damages incurred prior to the Board's change in policies. *Id.*

After the district court entered a corrected judgment for reasons not relevant to this appeal, both the plaintiffs and the intervenors timely appealed.

## II.  JURISDICTION

The district court had federal-question jurisdiction over this 42 U.S.C. § 1983 action. 28 U.S.C. § 1331. We have jurisdiction over the plaintiffs' appeal from an adverse final judgment. *Id.* § 1291.

## III.  ANALYSIS

"This is a case about nothing."[5] The course of federal litigation often involves a winnowing of issues. Where, as here, the process of separating wheat from chaff results in a threshing floor bare of justiciable claims, the case is over. For purposes of this appeal, the only remaining claim we need consider is Timothy Morrison's as-applied pre-enforcement challenge for nominal damages based on his allegations that the Board's policies during the 2004–05 school year "chilled" his speech. Because we conclude that Morrison lacks standing to pursue his claim of chilled speech, we affirm the district court's grant of summary judgment to the Board.

That a litigant must establish standing is a fundamental element in determining federal jurisdiction over a "case" or "controversy" as set forth in Article III of the Constitution. *E.g.*, *Raines v. Byrd*, 521 U.S. 811, 818 (1997) ("No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 37 (1976))). By now, it is axiomatic that a litigant demonstrates Article III standing by tracing a concrete and particularized injury to the defendant—whether actual or imminent—and establishing that a favorable judgment would provide redress. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). For purposes of this appeal, we focus on whether Morrison's alleged chill constitutes an injury-in-fact and, if so, whether nominal damages would provide sufficient redress. We treat each element in turn.

---

[5] *Husain v. Springer*, 494 F.3d 108, 136 (2d Cir. 2007) (Jacobs, C.J., concurring in part and dissenting in part).

A.    Injury-in-Fact

To avoid conferring standing by way of guesswork, we require that a litigant demonstrate either a concrete harm or the threat of such harm.[6]   *Laird v. Tatum*, 408 U.S. 1, 13 (1972); *ACLU v. Nat'l Sec. Agency*, 493 F.3d 644, 660 (6th Cir. 2007).  With respect to the standing of First Amendment litigants, the Supreme Court is emphatic: "Allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Laird*, 408 U.S. at 13–14; *see also Warth v. Seldin*, 422 U.S. 490, 501 (1975) (requiring a harm to be "distinct and palpable" for standing purposes).  In *Laird*, the Court confronted the question of "whether the jurisdiction of a federal court may be invoked by a complainant who alleges that the exercise of his First Amendment rights is being chilled by the mere existence, *without more*, of a governmental investigative and data-gathering activity."  408 U.S. at 10 (emphasis added).  As narrated by the Court, the injury-in-fact alleged by the *Laird* plaintiffs resulted from a confluence of subjective perceptions, beliefs, and apprehensions. *See id.* at 13 (hypothesizing that the plaintiffs' alleged chill arose from their "very perception of the system as inappropriate to the Army's role," or "beliefs that it is inherently dangerous for the military to be concerned with activities in the civilian sector," or "less generalized yet speculative apprehensiveness that the Army may at some future date misuse the information in some way that would cause direct harm").  Without more, the *Laird* Court deemed those allegations insufficient. *Id.* at 13–14.

The question before us, then, is what "more" might be required to substantiate an otherwise-subjective allegation of chill,[7] such that a litigant would demonstrate a proper injury-in-fact?  As might be expected, a variety of answers emerges across this court and our sister circuits.  A non-exhaustive list includes the following: the issuance of a temporary restraining order, *County Sec. Agency v. Ohio Dep't of Commerce*, 296 F.3d 477, 482–83 (6th Cir. 2002); *Howard Gault Co. v. Tex. Rural Legal Aid, Inc.*, 848 F.2d 544, 558 (5th Cir. 1988); an eight-month investigation into the activities and beliefs of the plaintiffs by Department of Housing and Urban Development officials, *White v. Lee*, 227 F.3d 1214, 1226, 1228 (9th Cir. 2000); and "numerous alleged seizures of membership lists and other property" belonging to the plaintiffs, *Nat'l Commodity and Barter Ass'n v. Archer*, 31 F.3d 1521, 1530 (10th Cir. 1994).  Even this abbreviated list confirms that for purposes of standing, subjective chill requires some specific action on the part of the defendant in order for the litigant to demonstrate an injury-in-fact.

---

[6] We note that the defendant here is the *school district.*  In *Monell v. Department of Social Services*, 436 U.S. 658 (1978), the Supreme Court constrained municipal liability to occasions when local government bodies took actions "under color of some official policy" that resulted in the violation of a constitutional right.  *Id.* at 692; *see also Doe v. Claiborne County*, 103 F.3d 495, 508 (6th Cir. 1996) ("In addition to showing that the School Board as an entity 'caused' the constitutional violation, plaintiff must also show a direct causal link between the custom and the constitutional deprivation . . . .").  In assessing whether Morrison experienced imminent harm, therefore, we look not to the high school or any particular administrator—but rather, to the policy as articulated by the Board.

[7] In the situation before us—an analysis of standing—any distinction between claims of past and future (i.e., forward-looking) chill lacks purpose.  Although one of our sister circuits distinguishes the two, arguing that a chill is "not merely subjective" once it "has already been experienced," *Husain*, 494 F.3d at 128, we decline to understand the *Laird* Court's definition of "subjective" as temporally bound. *See Laird*, 408 U.S. at 11 (finding no injury-in-fact where a chilling effect arose "merely from the individual's knowledge that a governmental agency was engaged in certain activities or from the individual's concomitant fear that, armed with the fruits of those activities, the agency might in the future take some other and additional action detrimental to that individual"); *see also* Oxford English Dictionary (2007) (defining "subjective" as "[r]elating to the thinking subject, proceeding from or taking place within the subject; having its source in the mind; . . . belonging to the conscious life").  Subjective emotions simply do not transform into objective facts—and thus a concrete injury—with the passage of time.  We make no distinction for standing purposes, therefore, between allegations of a past-experienced chill and allegations of chill seeking forward-looking relief.  Without more, both will fail to constitute an injury-in-fact.

Conversely, absent proof of a concrete harm, where a First Amendment plaintiff only alleges inhibition of speech, the federal courts routinely hold that no standing exists. *See, e.g.*, *Grendell v. Ohio Supreme Court*, 252 F.3d 828, 834 (6th Cir. 2001) ("[F]ears of prosecution cannot be merely 'imaginative or speculative.'" (quoting *Younger v. Harris*, 401 U.S. 37, 42 (1971))); *Adult Video Ass'n v. U.S. Dep't of Justice*, 71 F.3d 563, 566 (6th Cir. 1995) (same); *United Presbyterian Church in the U.S.A. v. Reagan*, 738 F.2d 1375, 1380 (D.C. Cir. 1984) (distinguishing a chilling effect from "the immediate threat of concrete, harmful action").

Characterizing chill as insufficient to establish standing is not original to this panel. In *Adult Video Association v. United States Department of Justice*, 71 F.3d 563 (6th Cir. 1995), we explained that First Amendment chill typically constitutes the "*reason* why the governmental imposition is invalid rather than . . . the harm which entitles [a party] to challenge it." *Id.* at 566 (quoting *United Presbyterian Church*, 738 F.2d at 1378). This understanding of chill comports with the underlying rationales of intersecting First Amendment doctrines. For example, the doctrine of overbreadth relies on a "chill" theory to permit a litigant—who *already has standing* by virtue of demonstrating a concrete harm—to challenge a rule that may only affect others. *See Midwest Media Prop., L.L.C. v. Symmes Twp.*, 503 F.3d 456, 463 (6th Cir. 2007) ("[O]verbreadth does not excuse a party's failure to 'allege an injury arising from the specific rule being challenged . . . .'" (quoting *Prime Media, Inc. v. City of Brentwood*, 485 F.3d 343, 351 (6th Cir. 2007))); *United Presbyterian Church*, 738 F.2d at 1379 ("It is only in this . . . respect that 'chilling effect' has anything to do with the doctrine of standing: It permits a person, who has standing to challenge governmental action because of the concrete harm it causes him, to assert a deficiency which may not affect him but only others."). In order to have standing, therefore, a litigant alleging chill must still establish that a concrete harm—i.e., enforcement of a challenged statute—occurred or is imminent. *See Am. Library Ass'n v. Barr*, 956 F.2d 1178, 1193 (D.C. Cir. 1992) ("[W]hether plaintiffs have standing . . . depends on how likely it is that the government will attempt to use these provisions against them . . . and not on how much the prospect of enforcement worries them.").

The claim at stake here involves Morrison's choice to chill his own speech based on his perception that he would be disciplined for speaking. But whether he would have been so punished, we can only speculate. The school district—again, the actual defendant here—stated that its former discipline policy regarding instances of harassment or discrimination "shall not be interpreted as applying to speech otherwise protected under the state or federal constitutions where the speech does not otherwise materially or substantially disrupt the educational process." The record is silent as to whether the school district threatened to punish or would have punished Morrison for protected speech in violation of its policy. Morrison asks us, essentially, to find a justiciable injury where his own subjective apprehension counseled him to choose caution and where he assumed—solely on the basis of the Board's 2004–05 policies and without any specific action by the Board—that were he to speak, punishment would result. We decline to do so. Absent a concrete act on the part of the Board, Morrison's allegations fall squarely within the ambit of "subjective chill" that the Supreme Court definitively rejected for standing purposes. *Laird*, 408 U.S. at 13 (quotation marks omitted). Morrison cannot point to anything beyond his own "subjective apprehension and a personal (self-imposed) unwillingness to communicate," *ACLU*, 493 F.3d at 662, and those allegations of chill, without more, fail to substantiate an injury-in-fact for standing purposes.

B.     Redressability

Though we determine that Morrison fails to state an injury-in-fact, we also comment on the second element of standing: whether nominal damages would redress Morrison's alleged injury. No readily apparent theory emerges as to how nominal damages might redress past chill. As Morrison's own counsel acknowledged at oral argument, nominal damages are a vehicle for a declaratory judgment. As such, nominal damages have "only declaratory effect and do not otherwise alter the legal rights or obligations of the parties. . . . [T]hey can sometimes constitute effectual

relief, *but only with respect to future dealings* between the parties." *Utah Animal Rights Coal. v. Salt Lake City Corp.*, 371 F.3d 1248, 1267–68 (10th Cir. 2004) (McConnell, J., concurring) (emphasis added). While we may have allowed a nominal-damages claim to go forward in an otherwise-moot case, *see Lynch v. Leis*, 382 F.3d 642, 646 n.2 (6th Cir. 2004); *Murray v. Bd. of Trs., Univ. of Louisville*, 659 F.2d 77, 79 (6th Cir. 1981), we are not required to relax the basic standing requirement that the relief sought must redress an actual injury.

In the situation before us, Morrison seeks nominal damages based on a regime no longer in existence. To confer nominal damages here would have *no* effect on the parties' legal rights. *See Utah Animal Rights,* 371 F.3d at 1268 (McConnell, J., concurring) ("Where . . . the challenged past conduct *did not give rise to a compensable injury* and there is no realistic possibility of a recurrence, nominal damages have no more legal effect than would injunctive or declaratory relief in the same case.") (emphasis added). Because nominal damages will not provide Morrison any redress, his suit fails to satisfy the second requirement for standing.

This case should be over. Allowing it to proceed to determine the constitutionality of an abandoned policy—in the hope of awarding the plaintiff a single dollar—vindicates no interest and trivializes the important business of the federal courts.

## IV. CONCLUSION

Morrison fails to demonstrate either a concrete harm or how a favorable judgment might redress his purported injury. As a result, he lacks standing and we affirm.

---

**DISSENT**

---

KAREN NELSON MOORE, Circuit Judge, dissenting. I find myself writing a dissent in this case upon the decision of the district judge sitting by designation to join with the former dissent and to grant panel rehearing. Adhering to the prior panel majority, I now dissent. I reiterate what I wrote as the former majority opinion in the dissent that follows,[1] *see* 507 F.3d 494, 497 (6th Cir. 2007), and I explain why the new majority is in error.

Timothy Morrison ("Morrison") was a student at Boyd County High School ("BCHS"). He is a Christian, and he believes that homosexuality is a sin. He further believes that part of his responsibility as a Christian is to tell others when their conduct does not comport with his understanding of Christian morality. During the 2004-05 academic year, BCHS had a written policy prohibiting students from making stigmatizing or insulting comments regarding another student's sexual orientation. Morrison did not want to be punished, so he kept to himself his beliefs regarding homosexuality.

After Morrison filed this lawsuit, the Board of Education of Boyd County ("Board") changed the BCHS policy, but the litigation did not end. We must now decide whether Morrison's claim for nominal damages premised upon the "chill" on Morrison's speech during the 2004-05 school year presents a justiciable controversy. As before, I conclude that it does and accordingly would reverse the district court's grant of summary judgment to the school board on this claim. Because genuine issues of material fact prevent us from determining the merits of Morrison's free-speech claim, I would remand the case to the district court for further proceedings.

## I. BACKGROUND

### A. Factual Background

In 2002, some students at BCHS petitioned to start a chapter of the Gay Straight Alliance ("GSA"). *Boyd County High Sch. Gay Straight Alliance v. Bd. of Educ. of Boyd County*, 258 F. Supp. 2d 667, 670 (E.D. Ky. 2003). Their efforts were met with hostility, which was not very surprising given BCHS students' history of intolerance toward homosexuality. *Id.* at 670-74. To quell the hostility, within two months of approving the GSA, the school banned the GSA, as well as purported to ban all other student organizations for the 2002-03 school year. *Id.* at 675.

In response, a group of students who had attempted to spearhead the GSA chapter and their parents sued the school district in federal court. After the district court issued a preliminary injunction requiring the school board to give the GSA chapter equal access to that afforded other student groups, *id.* at 693, the suit ended in a consent decree. One provision in the consent decree required the school district to adopt policies prohibiting harassment on the basis of actual or perceived sexual orientation, and to provide mandatory anti-harassment training to all students.

Prior to the 2004-05 school year, in attempting to comply with the consent decree, the school district adopted Policy 09.42811 as the district-wide anti-harassment policy. Policy 09.42811 prohibited "Harassment/ Discrimination," which it defined as

> unlawful behavior based on race, color, national origin, age, religion, sex[,] actual
> or perceived sexual orientation or gender identity, or disability that is sufficiently

---

[1]I note that the new majority has liberally adopted my prior opinion for its Parts I and II.

severe, pervasive, or objectively offensive that it adversely affects a student's education or creates a hostile or abusive educational environment.

The provisions in this policy shall not be interpreted as applying to speech otherwise protected under the state or federal constitutions where the speech does not otherwise materially or substantially disrupt the educational process . . . .

Joint Appendix ("J.A.") at 120. BCHS's 2004-05 Code of Conduct repeated the first paragraph of Policy 09.42811, J.A. at 270 (BCHS Code at 3) but later stated:

Harassment/discrimination is intimidation by threats of or actual physical violence; the creation by whatever means, of a climate of hostility or intimidation, or the use of language, conduct, or symbols in such manner as to be commonly understood to convey hatred, contempt, or prejudice or to have the effect of insulting or stigmatizing an individual.

J.A. at 277 (BCHS Code at 16).

Additionally, the school district created two training videos—one for Boyd County Middle School ("BCMS") and one for BCHS—to fulfill the anti-harassment training provisions of the consent decree. As relevant here, the high school training video included a lengthy discussion of the ills of bullying and name-calling. The participants included a BCHS social studies teacher,[2] some students, an "ADL Facilitator,"[3] and a clinical psychologist. Additionally, the BCHS training video contained a passage discussing sexual orientation. Near the end of this passage, the clinical psychologist stated,

. . . . We all get self-centered and start to think that our way is the right way and our way is the correct way. We all want to believe that we have evidence that our way is the correct way. . . .

So . . . no matter where you go, no matter what you do, no matter who you meet, you are going to find people that you don't like. You're going to find people that you disagree with. You're going to find people that you don't like the way they act. It can't be avoided, not, not anywhere in the world, it can't be avoided. You're going to find people that you believe are absolutely wrong. You're going to think[, W]hat are they thinking? That, that is so wrong, it[']s obvious to everybody[." B]ut not to them. Because they believe you are wrong. You can't avoid meeting people that you believe are wrong. But here is the kicker, just because you believe, just because you don't like them, just because you disagree with them, just because you believe they are wrong, whole heartedly, absolutely, they are wrong. *Just because you believe that does not give you permission to say anything about it.* It doesn't require that you do anything. You just respect, you just exist, you continue, you leave it alone. *There is not permission for you to point it out to them.*

J.A. at 229 (BCHS Training Video Tr. at 29) (emphasis added).

The new policies and the mandatory training sparked further acrimony in Boyd County. This time, some parents feared that the training would discourage, and the policies would prohibit, their

---

[2]This teacher was also the "compliance coordinator" under the consent decree.

[3]Although the record is unclear, it appears that "ADL" stands for "Anti-Defamation League."

children from speaking about their religious beliefs regarding homosexuality. Some parents withheld their children from the mandatory training. Eventually, a group of parents and students sued.

## B. Procedural Background

On February 15, 2005, a group of plaintiffs[4] filed their complaint in the United States District Court for the Eastern District of Kentucky. They named the Board as the sole defendant and pursued claims under 42 U.S.C. § 1983 for violations of various constitutional rights, specifically, their rights to free speech (styled as the "FIRST CAUSE OF ACTION"), due process (second cause of action), equal protection (third cause of action), and free exercise of religion (fourth cause of action). The crux of the plaintiffs' complaint is that the speech codes in effect during the 2004-05 school year prevented students in Boyd County from speaking their convictions that homosexuality is sinful, and the speech codes and training together undermined their ability to practice their Christian faith. For these asserted violations, the plaintiffs sought declaratory relief, injunctive relief, actual damages, nominal damages, costs, and attorney fees.

On April 18, 2005, the district court permitted the plaintiffs from the earlier action to intervene. The intervenors filed their Answer in Intervention that day, denying that the plaintiffs had suffered any constitutional violations.[5]

In August 2005, the Board revised its policy, as well as the BCMS and BCHS student codes of conduct. Under the revised codes, anti-homosexual speech would not be prohibited unless it was "sufficiently severe or pervasive that it adversely affects a student's education or creates a climate of hostility or intimidation for that student, both from the perspective of an objective educator and from the perspective of the student at whom the harassment is directed." J.A. at 655 (2005-06 BCHS Code of Conduct at 40); *accord* J.A. at 642 (2005-06 BCMS Discipline Code at 16). Additionally, the BCHS Code of Conduct stated, "The civil exchange of opinions or debate does not constitute harassment. Students may not, however, engage in behavior that interferes with the rights of another student or materially and substantially disrupts the educational process." J.A. at 655 (2005-06 BCHS Code of Conduct at 40).

After these revisions, the parties filed cross-motions for summary judgment. On February 17, 2006, the district court issued its opinion and judgment granting the Board's motion and denying both the plaintiffs' and the intervenors' motions. Noting the changes that had been made to the policies that were initially challenged, the district court indicated that it was "not inclined to adjudge the constitutionality of policies no longer in effect," and rejected all of the plaintiffs' challenges to the written policies on this basis. J.A. at 672 (Dist. Ct. Mem. Op. at 7). Additionally, the district court determined that the plaintiffs' claim for damages failed because "Plaintiffs were unable to specify the measure and amount of their alleged damages." J.A. at 680 (Dist. Ct. Mem. Op. at 15). The district court further stated that "even their request for nominal damages remains unsupported by any factual allegations," and that "Plaintiffs have made no specific plea" for damages incurred prior to the Board's change in policies. *Id.*

---

[4]The only plaintiff whose claim is relevant at this point of the litigation is Timothy Allen Morrison II ("Morrison"). At the time the complaint was filed, Morrison was a student at BCHS. The other plaintiffs are his parents Timothy and Mary Morrison, Brian Nolen, and Debora Jones. Both Nolen and Jones are parents of students who attended Boyd County Middle School at some time relevant to this case.

[5]Later, the intervenors changed their position and argued that the 2004-05 BCHS speech code was unconstitutional.

After the district court entered a corrected judgment for reasons not relevant to this appeal, both the plaintiffs and the intervenors timely appealed.

## II. JURISDICTION

The district court had federal-question jurisdiction over this 42 U.S.C. § 1983 action.  28 U.S.C. § 1331.  We have jurisdiction over the plaintiffs' appeal from an adverse final judgment.  *Id.* § 1291.

## III. ANALYSIS

Our initial task is to determine exactly which claims are, and which are not, presented in this appeal.  First, the plaintiffs do not challenge the district court's rejection of their free-exercise claim, which we accordingly do not consider.  Next, the district court concluded that once the school district had revised its policy in a fashion acceptable to the plaintiffs and intervenors, the plaintiffs' claims seeking forward-looking relief, i.e., declaratory and injunctive relief, became moot.  The plaintiffs do not challenge this conclusion on appeal, so we do not consider their claims seeking such relief.

The plaintiffs, however, also pursued claims for damages, both nominal and compensatory.  On appeal, the plaintiffs pursue only their claim for nominal damages and seek to premise this claim on Timothy Morrison's (the BCHS student plaintiff's) "chilled" speech during the 2004-05 school year.  Consequently, the only plaintiff who may have a live claim is Timothy Morrison.  Accordingly, Morrison's free-speech claim seeking nominal damages is the only claim properly considered on appeal.[6]

## A. Justiciability

### 1. Mootness

The district court concluded that, because the school district had changed its policy, the case was moot, notwithstanding Morrison's claim for nominal damages.  It offered two reasons for this analysis:  First, the district court said that the plaintiffs had never requested nominal damages specifically for the period preceding the Board's amendment of the offending policies.  Second, the district court said that the plaintiffs failed to substantiate the nominal-damages claim with factual allegations.

I believe that the first reason is inaccurate, as the complaint clearly requests "an award of actual and nominal damages in an amount deemed appropriate by" the district court.  J.A. at 34 (Compl. at 14, ¶ d.).  Because the offending policy was in effect when the plaintiffs filed their complaint, their request for nominal damages could have addressed only the period preceding the Board's amendment.

The district court's second reason misapprehends the nature of nominal damages.  Nominal damages are awarded when a plaintiff suffered a deprivation of a constitutional right, but the

---

[6]The plaintiffs' briefs also press their equal-protection and due-process claims, but the arguments offered in support of their equal-protection theory are wholly duplicative of their free-speech arguments.  The plaintiffs' due-process theory—that the 2004-05 speech code was unconstitutionally vague—similarly presents a First Amendment argument under a different label.  Indeed, the primary case that the plaintiffs' brief cites in support of their due-process argument, *Sypniewski v. Warren Hills Regional Board of Education*, 307 F.3d 243 (3d Cir. 2002), analyzed the plaintiff's void-for-vagueness theory as a First Amendment argument.  *Id.* at 266-67.  Because the plaintiffs' due-process and equal-protection arguments are essentially First Amendment arguments masquerading as Fourteenth Amendment arguments, we do not address them separately.

plaintiff lacks proof that he or she experienced an "actual injury" arising from that deprivation. *Carey v. Piphus*, 435 U.S. 247, 266-67 (1978). We have recognized that nominal damages are appropriate when a plaintiff proves a constitutional violation but lacks proof of an actual injury. *Sutton v. Cleveland Bd. of Educ.*, 958 F.2d 1339, 1352 (6th Cir. 1992) (procedural due-process claim; citing *Carey v. Piphus*).

Moreover, because nominal damages are a symbolic remedy for past wrongs, a prayer for nominal damages precludes a finding of mootness, even when the defendant has altered or abandoned the allegedly unconstitutional policy forming the basis for the plaintiff's complaint. *Murray v. Bd. of Trs., Univ. of Louisville*, 659 F.2d 77, 79 (6th Cir. 1981) (remanding First Amendment case to district court for adjudication of plaintiff's nominal-damage claim); *see also Blau v. Ft. Thomas Pub. Sch. Dist.*, 401 F.3d 381, 387 (6th Cir. 2005) ("[T]he existence of a damages claim ensures that this dispute is a live one . . . ."); *id.* at 387-88 (citing cases); *Lynch v. Leis*, 382 F.3d 642, 646 n.2 (6th Cir. 2004) ("[A] claim for nominal damages . . . is normally sufficient to establish standing, defeat mootness, and grant prevailing party status . . . ."); *Utah Animal Rights Coal. v. Salt Lake City Corp.*, 371 F.3d 1248, 1257-58 (10th Cir. 2004) (following Tenth Circuit precedent holding that claim for nominal damages is sufficient for justiciability); *id.* at 1268 (McConnell, J., concurring) (noting that the Sixth Circuit as well as the Ninth Circuit holds that a nominal-damages claim precludes mootness, but disagreeing with the rule); *id.* at 1275 (Henry, J., concurring) ("[T]he Supreme Court has directly and indirectly indicated that a claim for nominal damages in a constitutional case may vindicate rights that should be scrupulously observed, and hence, such a case is not, nor should it be, moot."). For these reasons, Morrison's nominal-damages claim is not moot.

## 2. Morrison's Standing

I next consider Morrison's standing to bring his nominal-damages claim. The key questions here are whether the "chill" on Morrison's speech constituted a sufficient injury to confer standing and whether the federal district court had the capacity to redress such a harm. In considering whether a case or controversy exists conferring subject-matter jurisdiction on our court, we must evaluate standing at the time the plaintiff filed his or her complaint and not at anytime thereafter. *Cleveland Branch, NAACP v. City of Parma*, 263 F.3d 513, 524-26 (6th Cir. 2001). We have relied on Supreme Court precedent to explain the distinction between standing and mootness: "standing concerns only whether a plaintiff has a viable claim that a defendant's unlawful conduct 'was occurring at the time the complaint was filed,' . . . while mootness addresses whether that plaintiff continues to have an interest in the outcome of the litigation." *Id.* at 525 (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 184 (2000)). Accordingly, we should not be concerned with whether the policy caused a past or future chill on Morrison's speech as judged from our current temporal vantage point but rather whether, at the time Morrison filed his complaint in February 2005 (prior to the August amendment of the BCHS speech policy), he possessed standing.[7]

---

[7]Concerns regarding "chilled" speech may take several forms. For example, the doctrine of overbreadth constitutes an exception to prudential standing requirements and permits a party with constitutional standing to raise First Amendment claims of third parties who are not present, but whose speech may be chilled in the future if the regulation stands. *Prime Media, Inc. v. City of Brentwood*, 485 F.3d 343, 349 (6th Cir. 2007); *West v. Derby Unified Sch. Dist. No. 260*, 206 F.3d 1358, 1367 (10th Cir. 2000). Similarly, a statute may be void for vagueness if it would deter would-be speakers from speaking because they cannot tell whether their intended speech falls within the statute's prohibitions. *See, e.g.*, *Reno v. ACLU*, 521 U.S. 844, 871-72 (1997) ("The vagueness of [a content-based speech] regulation raises special First Amendment concerns because of its obvious chilling effect on free speech."); *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972) (noting that a vague statute "operates to inhibit the exercise of [First Amendment] freedoms" (citation omitted)). Here, however, Morrison makes an as-applied rather than a facial challenge to the school district's speech code, focusing on the chilling effect the anti-harassment policy had on his speech. Morrison argues that he would have spoken during the 2004-05 school year, but that the speech code then in effect prevented him from doing so.

To determine whether a chill on speech confers standing, we apply a three-part test.  A plaintiff has constitutional standing when he or she can show:  (1) an injury-in-fact that; (2) was "fairly traceable to the defendant's allegedly unlawful conduct"; and (3) is "likely to be redressed" via a favorable decision. *Prime Media, Inc. v. City of Brentwood*, 485 F.3d 343, 349 (6th Cir. 2007) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).  I consider these parts in turn.

### a. Injury-In-Fact

The Supreme Court has defined an "injury-in-fact" as "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (internal quotation marks and citations omitted).

I believe that Morrison has established a concrete, particularized, and actual injury. Morrison alleged in his complaint that "School District policies and practice prohibit students from speaking in a manner that has the effect of insulting or stigmatizing another." J.A. at 21 (Compl. at ¶ 2.)  Morrison further alleged that "School district policies and practice prohibit students from telling someone who is a homosexual that they believe homosexuality is wrong." J.A. at 22 (Compl. at ¶ 3).  Morrison's affidavit attached to his cross-motion for summary judgment stated that the school district's policies prohibited him from expressing "an ideological and a sincere religious belief that [he] must inform those that engage in destructive lifestyles, like homosexuality, that they are wrong." J.A. at 625 (Morrison Aff. at ¶ 5).  There is nothing conjectural about the injury caused by a ban on constitutionally protected speech that carries the threat of punitive enforcement.

Our sister circuits have held, both implicitly and explicitly, that a chill on an individual's ability to exercise his or her right to free speech is a constitutional injury-in-fact.  For instance, in *White v. Lee*, 227 F.3d 1214 (9th Cir. 2000), the Ninth Circuit held that government officials' "eight-month investigation into the plaintiffs' [associational] activities and beliefs chilled the exercise of their First Amendment rights," which entitled the plaintiffs "to seek a remedy for this constitutional violation." *Id.* at 1226.  Similarly, in *National Commodity & Barter Ass'n v. Archer*, 31 F.3d 1521 (10th Cir. 1994), the Tenth Circuit held that an organizational plaintiff could premise a *Bivens* claim seeking damages for a violation of First Amendment associational rights upon overzealous investigative procedures that had a chilling effect on its members' associational rights. *Id.* at 1530. The court implicitly concluded that a chill represents an injury-in-fact, stating that the plaintiffs could "establish their First Amendment claim" by "prov[ing] wrongful conduct by the defendant and that such conduct had a chilling effect on the plaintiffs' organizational activities and associational rights." *Id.* at 1531 n.4.

Additionally, in *Howard Gault Co. v. Texas Rural Legal Aid, Inc.*, 848 F.2d 544 (5th Cir. 1988), the Fifth Circuit suggested, if not implicitly held, that chilled speech constitutes an injury-in-fact.  There, the court sustained an award of damages to compensate a plaintiff "for whatever injuries [he] may have suffered to his reputation and from the chilling effect the TRO had on the exercise of his First Amendment rights." *Id.* at 557.  And more recently, the Second Circuit joined this chorus with its opinion in *Husain v. Springer*, 494 F.3d 108 (2d Cir. 2007).  In *Husain*, a group of college-student journalists sued, claiming that the college president violated their First Amendment rights by nullifying the results of, and rescheduling, a student-government election in response to a hyper-partisan issue of a college newspaper.  They sought nominal damages and premised this First Amendment claim upon chilled speech, specifically, the paper's subsequent reduction in election coverage out of fear that favorable coverage would lead to the disqualification of a candidate. *See id.* at 119 (noting that "the *College Voice* editors decided to give their endorsement of [a student party running the subsequent school year] less prominence" as a result of the election nullification).  Even though the results of the nullified election and the subsequent election were identical, the court held that the "chilling effect" upon the paper's coverage "g[ave] rise to a First Amendment injury." *Id.* at 128; *see also id.* (concluding that the election nullification

"violated the plaintiffs' First Amendment rights as a result of the chill on student speech that it created"). Each of the aforementioned cases indicates that a chill of expressive conduct constitutes a constitutional injury-in-fact sufficient to confer standing; to our knowledge, no circuit has concluded to the contrary.[8]

In support of its contrary conclusion, the majority reads the holding of *Laird v. Tatum*, 408 U.S. 1 (1972), in an overly broad manner not warranted by precedent from either our own or our sister circuits. In *Laird*, a group of citizens brought a class action seeking declaratory and injunctive relief, arguing that the Army's investigative and data-gathering activities chilled their exercise of First Amendment rights. The Supreme Court concluded that the plaintiffs had not alleged a sufficiently specific injury, noting that a "subjective chill" cannot substitute for "specific present objective harm or a threat of specific future harm." *Id.* at 13-14.

I do not believe this concern regarding a "subjective chill" applies here, as *Laird* is easily distinguishable. *Laird* was a narrow decision, and the Court took pains to cabin its holding to the particular facts of that case, stating, "[O]ur conclusion is a narrow one, namely, that on this record the respondents have not presented a case for resolution by the courts." *Laird*, 408 U.S. at 15. Most significantly, the plaintiffs in *Laird* did not challenge the constitutionality of the statute that they alleged chilled their speech. *Id.* at 5. By contrast, Morrison argues that the school district's 2004-05 anti-harassment policy directly prohibited constitutionally protected speech in violation of the First Amendment. The *Laird* Court emphasized that it faced a case in which "the chilling effect ar[o]se merely from the individual's knowledge that a governmental agency was engaged in certain activities or from the individual's concomitant fear that, armed with the fruits of those activities, the agency might in the future take some other and additional action detrimental to that individual." *Id.* at 11. To the contrary, in this case (as in a series of other "chilling" cases that the *Laird* Court distinguished), "the challenged exercise of governmental power was regulatory, proscriptive, or compulsory in nature, and the plaintiff was either presently or prospectively subject to the regulations, proscriptions or compulsions that he [i]s challenging." *Id.* at 11. Unlike the plaintiffs in *Laird*, therefore, Morrison does not argue that information-gathering or similar activities have chilled his speech but rather that a regulatory proscription on speech chilled his speech. The majority reads *Laird* in a manner more capacious than prior interpretations in order to draw a strained analogy between Morrison's claim and that of the plaintiffs in *Laird*. The majority does so without addressing any of my arguments distinguishing *Laird*, resulting in an opinion that significantly restricts standing under the First Amendment.

The *Laird* Court's concern regarding a significant attenuation between the action or policy complained of and the chill alleged does not apply here. *See infra* Pt. III.A.2.(b). Morrison challenges a *rule* that was intended to govern his speech and that of his cohorts, not data-gathering activities. Consequently, this is not a case in which the plaintiff has "left somewhat unclear the precise connection between" the action or policy complained of and the chill alleged, as was the case in *Laird*. *Id.* at 13 n.7. Moreover, the *Laird* Court was also motivated by its desire to avoid the federal courts becoming "virtually continuing monitors of the wisdom and soundness of Executive action." *Id.* at 15. This case presents no such threat.

For the foregoing reasons, I believe that *Laird* does not control, and that we should follow the lead of the Second, Fifth, Ninth, and Tenth Circuits (in *Husain*, *Howard Gault Co.*, *White*, and *Archer*, respectively). The majority opinion deduces a new standard from a survey of the caselaw, proposing that a "subjective chill requires some specific action on the part of the defendant in order

---

[8] In the Fourth Circuit, Judge Michael argued persuasively in dissent that previously chilled speech presents "a classic First Amendment injury." *Reyes v. City of Lynchburg*, 300 F.3d 449, 458 (4th Cir. 2002) (Michael, J., dissenting). The majority opinion neither quibbled with nor endorsed this view, but instead concluded that the plaintiff failed to show that the defendant city's decision to prosecute him had chilled his speech. *Id.* at 455 n.8.

for the litigant to demonstrate an injury-in-fact." Maj. Op. at 6. This standard unnecessarily muddles established doctrine and because of its lack of clarity may also contradict the Supreme Court's holding that to obtain standing a plaintiff must allege "a 'claim of specific present objective harm *or a threat of specific future harm.*'" *Bigelow v. Virginia*, 421 U.S. 809, 816-17 (1975) (quoting *Laird*, 408 U.S. at 13-14) (emphasis added). The majority's "specific action" requirement may occlude the doctrine that a threat which chills a plaintiff's speech constitutes an injury-in-fact.

In this case, Morrison argues that the 2004-05 speech policy threatened him with suspension if he spoke out about his views on homosexuality. In February 2005 when Morrison filed his complaint, the threatened suspension loomed above him "like the proverbial sword of Damocles" and silenced his speech. *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 882 (1997). The Supreme Court does not require that a plaintiff who is specifically threatened with punishment if he engages in particular speech must "first expose himself to actual [punishment] to be entitled to challenge a [regulation] that he claims deters the exercise of his constitutional rights." *Steffel v. Thompson*, 415 U.S. 452, 459 (1974). The 2004-05 speech policy itself amounted to a specific threat regarding future harm and is sufficient to confer standing on Morrison.

The cases cited by the majority, in support of the general proposition that the courts dismiss cases for lack of standing when plaintiffs assert only inhibition of speech, are readily distinguishable. In *Grendell v. Ohio Supreme Court*, 252 F.3d 828, 834 (6th Cir. 2001), we held that the chilling effect caused by an attorney's fear of future sanctions, which might hypothetically be imposed in an unconstitutional manner, did not confer standing. Likewise, in *Adult Video Ass'n v. United States Department of Justice*, 71 F.3d 563, 566 (6th Cir. 1995), we held that the chilling effect caused by "*concededly valid* criminal antiobscenity laws [on] the distribution of what [the plaintiffs] believe[d] to be constitutionally protected materials" did not confer standing. Neither of these cases, however, involved the type of direct, regulatory proscription on protected speech akin to the school district policy at issue in this case. While *Grendell* and *Adult Video* resembled *Laird* in that they involved constitutionally valid judicial and government actions that caused plaintiffs to experience a subjective chill, there is little subjective about the silence induced by the unambiguously punitive ban on speech at issue in this case. The District of Columbia Circuit's denial of standing in *United Presbyterian Church in the U.S.A. v. Reagan*, 738 F.2d 1375, 1378-79 (D.C. Cir. 1984), is similarly inapposite because that case involved plaintiffs' challenge to intelligence-gathering activities rather than a regulatory proscription on speech. At the time Morrison filed his complaint, the instant case did not implicate merely Morrison's "difficulty [in] determining the application of a regulatory provision to [his] conduct," but rather the "imminence of concrete, harmful action," i.e., suspension, "for specifically contemplated First Amendment activity," i.e. criticism of homosexuality. *Id.* at 1380. Accordingly, I think that the caselaw within our circuit and our sister circuits requires the conclusion that the chill on Morrison's speech constitutes a sufficient injury-in-fact to satisfy the first part of the test for standing.

I should note that although the school district is the defendant in this case, we may also look at the BCHS Code of Conduct as well as at the BCHS training video to determine whether Morrison suffered an injury-in-fact. The majority argues that we may only look at the school board's 2004-05 speech policy to determine harm. The majority's citation to two Supreme Court and Sixth Circuit cases, however—*Monell v. Department of Social Services*, 436 U.S. 658 (1978), and *Doe v. Claiborne County*, 103 F.3d 495 (6th Cir. 1996)—does not support this conclusion. Maj. Op. at 6 n.6.

Before explaining why the majority's reliance on *Monell* and *Doe* is misguided, however, I think it is important to observe that in assessing standing under the official school district policy we are not evaluating the merits of Morrison's claim. "The party invoking federal jurisdiction bears the burden of establishing" jurisdiction, including the elements of standing. *Lujan*, 504 U.S. at 561. "[E]ach element must be supported in the same way as any other matter on which the plaintiff bears

the burden of proof." *Id.* Accordingly, "[i]n response to a summary judgment motion, . . . the plaintiff can no longer rest on . . . 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts,' Fed. Rule Civ. Proc. 56(e), which for purposes of the summary judgment motion will be taken to be true." *Id.* To the extent, then, that the majority emphasizes that we may consider the official policy alone, for the purpose of suggesting that the official policy does not raise a constitutional dilemma even if the BCHS Code of Conduct and training videos do so, the majority improperly intermingles the merits with the issue of standing. The question at this stage of the litigation is whether Morrison has set forth specific facts which if taken as true establish the elements of standing: injury-in-fact, causation, and redressability.

The majority mistakenly cites *Monell* for the proposition that a plaintiff may bring a § 1983 claim only when a local government body violates an official policy. Instead, *Monell* held that "although the touchstone of the § 1983 action against a government body is an allegation that official policy is responsible for a deprivation of rights protected by the Constitution, local governments . . . may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." 436 U.S. at 690-91. In this case, Morrison argues that the school district's official speech policy during the 2004-05 academic year violated his right to free speech; thus, Morrison does not need to rely on *Monell*'s holding to support his claim. To the extent that the BCHS Code of Conduct and training video constituted customary means of enforcing the speech policy, *Monell* only further supports Morrison's argument that both the school district policy on its face and its mode of enforcement violated the First Amendment.

Neither does *Doe v. Claiborne County* buttress the majority's conclusion that we may evaluate only the school district's official policy. In *Doe*, we held that to win a § 1983 claim arising from a teacher's sexual abuse, the plaintiff would have to show that the defendant board of education had a custom of condoning or tolerating such abuse and that this custom or policy caused her injury. 103 F.3d at 507-08. Here, Morrison has established the requisite link between school district policy and the BCHS Code of Conduct and training video by showing that these materials represented efforts by BCHS to enforce the school district's official policy. Moreover, the school district's attorney conceded at oral argument that BCHS gave students only the Code of Conduct and not the school district policy. Although the district made the latter available on the internet, the students at BCHS would have reasonably concluded that the Code of Conduct represented the school district's practical enforcement of official policy. In conclusion, although I believe that Morrison should be able to establish standing on the basis of the injury caused by official school district policy alone, I also believe that the further injury caused by the BCHS Code of Conduct and training video supports his argument for standing. The majority's interpretations of precedent to the contrary are completely misguided.

### b. Causation

Morrison easily satisfies the causation part of the standing inquiry. The Complaint alleges that "[t]he named student plaintiff has refrained from conveying his views on homosexuality to his classmates because the School District policies restricting speech prohibit him from doing so." J.A. at 26 (Compl. ¶ 34). Further, Morrison testified through affidavit that he held his tongue because of the policy. This testimony is uncontroverted.

### c. Redressability

Finally, I believe that Morrison satisfies the third part—redressability—of the standing inquiry. To reiterate, our analysis must evaluate the redressability part of the test for standing at the time Morrison filed his complaint. *Cleveland Branch, NAACP*, 263 F.3d at 524-26. When Morrison filed his complaint in February 2005, the school district had not yet amended its speech policy.

Morrison alleged in his complaint that the policy then in place restricted his constitutionally protected speech and silenced him in violation of the First Amendment. "It can scarcely be doubted that, for a plaintiff who is injured or faces the threat of future injury due to illegal conduct ongoing at the time of suit, a sanction that effectively abates that conduct and prevents its recurrence provides a form of redress." *Friends of the Earth*, 528 U.S. at 185-86. The United States District Court for the Eastern District of Kentucky had the capacity to redress Morrison's injury by enjoining the then-existing anti-harassment policy and awarding him damages.

In support of the conclusion that nominal damages cannot redress a past chill on speech caused by a legal regime that no longer exists, the majority relies wholly upon a single judge's concurrence in *Utah Animal Rights*. Writing for himself alone, Judge McConnell argued that nominal damages should not render a case live that would otherwise be moot because the legal regime being challenged no longer exists. *Utah Animal Rights*, 371 F.3d at 1267-68 (10th Cir. 2004) (McConnell, J., concurring). The portion of Judge McConnell's opinion which the majority cites made an argument about mootness not redressability. This is in keeping with well-established doctrine that to obtain standing, a plaintiff must have a redressable injury at the time of the filing of the complaint, while mootness addresses whether a live controversy continues to exist after a change of circumstances.

The majority's reliance on Judge McConnell's concurrence with respect to the redressability component of standing is mistaken for an additional reason. Judge McConnell recognized that his argument would require overturning established Tenth Circuit precedent. *Id.* at 1267. Indeed, that is why Judge McConnell was able also to author the majority in *Utah Animal Rights*, holding that however "odd," "a complaint for nominal damages could satisfy Article III's case or controversy requirements, when a functionally identical claim for declaratory relief will not." 371 F.3d at 1257. Judge McConnell's concurrence represents a singular opinion admittedly contrary to the caselaw in his own circuit and is not persuasive precedent capable of buttressing the majority's argument that Morrison does not have standing.

The majority argues that "[t]his case should be over" because the legal regime that Morrison challenges no longer exists. Maj. Op. at 8. Because the majority's argument centers on whether the instant case is live at the time of the appeal, rather than with whether the district court could redress Morrison's injury at the time of the filing of his complaint, I believe that a concern with mootness rather than redressability animates the majority's opinion.[9] As I have explained, the majority's statement that nominal damages cannot redress a past chill on speech misunderstands the redressability component of standing and is not supported by authoritative precedent.[10] Tellingly, the majority does not disagree with my argument that, under clearly established Sixth Circuit

---

[9]Even Judge McConnell's concurrence highlighted the distinction between these two doctrines of justiciability. He wrote that "[s]tanding doctrine addresses whether, at the inception of the litigation, the plaintiff had suffered a concrete injury that could be redressed by action of the court. Mootness addresses whether the plaintiff continues to have such a stake throughout the course of the litigation." *Utah Animal Rights*, 371 F.3d at 1263. Accordingly, while Judge McConnell believed that the case before him should be moot (even though Tenth Circuit precedent mandated the contrary holding), he concluded that plaintiffs in *Utah Animal Rights* did have standing. *Id.* at 1264. The majority thus misapplies the only source on which it relies.

[10]The majority opinion, Maj. Op. at 7, correctly alludes to a statement by Morrison's counsel at oral argument that Morrison sought a "declaratory judgment that the speech policies of 2004-2005 were unconstitutional, due to our nominal damages claim." The majority opinion then cites Judge McConnell's concurrence in *Utah Animal Rights* for the proposition that nominal damages cannot redress past unconstitutional policies and can provide "effectual relief, *but only with respect to future dealings* between the parties." *Id.* at 7-8 (quoting *Utah Animal Rights*, 371 F.3d at 1267-1268). The majority's logic is flawed for the same reasons that its broader reliance on Judge McConnell's concurrence is flawed: the McConnell concurrence itself admits that it conflicts with binding Tenth Circuit precedent; the concurrence is also in conflict with Sixth Circuit caselaw; the concurrence discusses mootness and not standing doctrine; and standing must be evaluated from the perspective of the time at which the plaintiff filed his or her complaint.

precedent, a claim for nominal damages suffices to preserve a case as live even if the challenged legal regime no longer exists. In effect, I think the majority opinion mistakenly camouflages a belief that the case is moot in a discussion of redressability, resulting in an opinion that misinterprets standing doctrine and is silent with respect to relevant precedent concerning mootness doctrine.

Because my argument regarding mootness stands unchallenged and because I believe that Morrison's injury caused by the school district's policy was redressable at the time he filed his complaint, I believe both that Morrison has standing and that the instant case represents a live controversy.

In conclusion, I must respond to the majority's conclusion that allowing a suit for nominal damages to proceed "trivializes the important business of the federal courts." Maj. Op. at 8. This conclusion undermines our own precedent holding that cases for nominal damages are not moot even when the challenged legal regime no longer exists. Furthermore, the majority's peevish sense that the instant action is a waste of the federal courts' time minimizes the federal courts' essential role in protecting free expression under the First Amendment. Public school students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969). Far from dismissing the importance of free speech in the schools, the Supreme Court has admonished that "'[t]he vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools.'" *Keyishian v. Bd. of Regents of Univ. of State of New York*, 385 U.S. 589, 603 (1967) (quoting *Shelton v. Tucker*, 364 U.S. 479, 487 (1960)). Thus, while the Court "has long recognized that local school boards have broad discretion in the management of school affairs," the Court has "at the same time . . . necessarily recognized that the discretion of the States and local school boards in matters of education must be exercised in a manner that comports with the transcendent imperatives of the First Amendment." *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 863-64 (1982) (plurality opinion).

## B. Merits

Because this case involves private student expression occurring on a school campus rather than school-sponsored speech, we analyze Morrison's claim under the standard set forth in *Tinker v. Des Moines Independent Community School District* rather than the standard set forth in *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260 (1988). *Curry ex rel. Curry v. Hensiner*, 513 F.3d 570, 576-77 (6th Cir. 2008); *Poling v. Murphy*, 872 F.2d 757, 762 (6th Cir. 1989), *cert. denied*, 493 U.S. 1021 (1990). *Tinker* held that schools cannot restrict student speech that neither "materially and substantially interfer[es] with the requirements of appropriate discipline in the operation of the school" nor "collid[es] with the rights of others." 393 U.S. at 513. In *Morse v. Frederick*, --- U.S. ---, 127 S. Ct. 2618, 2625 (2007), the Supreme Court held that "a principal may, consistent with the First Amendment, restrict student speech at a school event, when that speech is reasonably viewed as promoting illegal drug use." While acknowledging that "the mode of analysis set forth in *Tinker* is not absolute," *id.* at 2627, the Court also reaffirmed the doctrine that a school may not prohibit student speech solely on the ground that the speech is "offensive." *Id.* at 2629. Of the five justices in the majority, two who joined the Court's opinion construed it as going "no further than to hold that a public school may restrict speech that a reasonable observer would interpret as advocating illegal drug use and . . . provid[ing] no support for any restriction of speech that can plausibly be interpreted as commenting on any political or social issue." *Id.* at 2636 (Alito, J., concurring). Therefore, the holding of *Morse* is inapplicable here, and the *Tinker* mode of analysis remains the correct framework in this case.

The Board asks us to affirm the district court's grant of summary judgment on the merits, arguing that the policies in effect during the 2004-05 school year were consistent with the standard set out in *Tinker*. At the same time, Morrison asks us to grant him summary judgment on his

nominal damages claim because his affidavit testimony that he withheld his speech because of the policy was uncontradicted, and because the policy, he claims, fails to comport with *Tinker*. I would decline both parties' entreaties and instead reverse the district court's judgment insofar as it pertains to Morrison's free-speech claim seeking nominal damages and remand for further proceedings. I would do so for two reasons.

First, there remains a genuine issue of material fact regarding the policy applicable to Morrison during the 2004-05 school year. The Board contends that Morrison could not have been disciplined because the *school district*'s speech policy contained a savings clause preventing it from "apply[ing] to speech otherwise protected under the state or federal constitutions . . . ." J.A. at 120 (2004-05 Sch. Dist. Policy 09.42811). The BCHS Code, by contrast, contains no such savings clause in either of its definitions of harassment. The first definition restricted harassment to "unlawful behavior based on" a protected characteristic, including sexual orientation, "that is sufficiently severe, pervasive, or objectively offensive that it adversely affects a student's education or creates a hostile or abusive educational environment." J.A. at 270 (2004-05 BCHS Student Code at 3). This definition tacks quite closely to the *Tinker* standard. *See Tinker*, 393 U.S. at 513. The other definition, by contrast, does not. Under the heading "DISCIPLINARY INFRACTIONS," the 2004-05 BCHS Code defined harassment to include "the use of language . . . in such manner as to be commonly understood to convey hatred, contempt, or prejudice or to have the effect of insulting or stigmatizing an individual." J.A. at 277 (2004-05 BCHS Student Code at 16). Immediately following this definition, the BCHS Code listed a series of consequences for violating the prohibition on harassment, which could be read as implying that this represents the operative definition of harassment.

If these inconsistencies were not enough, it is also unclear to what extent the statements in the training video represented the school's policy. The video's prohibition appears to have been even broader than the latter definition of harassment in the Student Code, as the video informed students that "[t]here is not permission for you to point . . . out" areas in which they disagree with other students. J.A. at 229 (BCHS Training Video Tr. at 29). Because the district court did not address the merits of Morrison's free-speech claim, it did not have occasion to determine which policy governed Morrison's conduct at school during the 2004-05 academic year. I would decline to address this issue in the first instance, concluding that the more prudent course of action is to remand the case to the district court for appropriate factual development.

Second, I believe that an objective inquiry is necessary in addition to an inquiry into whether Morrison personally experienced chilled speech, as he alleges. If individual chill alone were enough to prove a violation of the First Amendment, such a holding would permit anyone who operates under an unconstitutional speech policy to sue (within the applicable statute of limitations) and win merely by filing an affidavit claiming that the policy prevents him or her from saying something that he or she wishes to say. For the plaintiff to win his or her claim on the merits, however, he or she must not only prove that the personal chill occurred but also must meet a more objective standard.

I find support for such a requirement in our case law, specifically in our jurisprudence regarding First Amendment retaliation claims. Plaintiffs alleging such claims must prove that "an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in [First Amendment-protected] conduct." *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc). This element introduces an objective component into the First Amendment inquiry by requiring that the adverse action "would deter a person of ordinary firmness from" exercising First Amendment rights. Along these lines, I would hold that when a plaintiff seeks to prove under the First Amendment a damages claim premised upon chilled speech, he or she must establish that the policy or action of the defendant would deter a person of ordinary firmness from exercising his or her First Amendment rights in the way the plaintiff alleges he or she would have, but for the defendant's action or policy. I am not alone in this view, as the Ninth Circuit

requires plaintiffs in similar cases to establish this element. *See White v. Lee*, 227 F.3d 1214, 1228 (9th Cir. 2000).

As the parties have not had occasion to address this element, I would leave it for the district court to do so on remand.

## IV.  CONCLUSION

For the reasons described above, I believe that an allegation of a chill of First Amendment-protected activity is sufficient to confer standing.  Furthermore, a First Amendment challenge to a legal regime no longer in existence is not moot when a plaintiff seeks relief in the form of nominal damages.  I also believe that to establish such a claim on the merits, a plaintiff must show that the defendant's actions or policy would deter a person of ordinary firmness from exercising his or her First Amendment liberties in the way that the plaintiff alleges he or she would have, were it not for the defendant's conduct or policy.  Consequently, I would reverse the district court's grant of summary judgment to the Board, but only insofar as it pertains to Morrison's free-speech claim seeking nominal damages.  I would also remand this case to the district court for further proceedings consistent with this opinion.