*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 09a0020p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

GEOFFREY NELS FIEGER and RICHARD L. STEINBERG,

          *Plaintiffs-Appellees,*

    *v.*

MICHIGAN SUPREME COURT; CLIFFORD W. TAYLOR; MAURA D. CORRIGAN; ROBERT P. YOUNG, JR.; and STEPHEN J. MARKMAN,

          *Defendants-Appellants,*

MICHAEL F. CAVANAUGH; ELIZABETH A. WEAVER; and MARILYN KELLY,

          *Defendants.*

No. 07-2213

> Appeal from the United States District Court
> for the Eastern District of Michigan at Detroit.
> No. 06-11684—Arthur J. Tarnow, District Judge.

Argued:  October 23, 2008

Decided and Filed:  January 20, 2009

Before:  BOGGS, Chief Judge; MERRITT and GRIFFIN, Circuit Judges.

_____

## COUNSEL

**ARGUED:**  Margaret A. Nelson, OFFICE OF THE ATTORNEY GENERAL, Lansing, Michigan, for Appellants.  Michael R. Dezsi, FIEGER, FIEGER, KENNEY, JOHNSON & GIROUX, Southfield, Michigan, for Appellees.  **ON BRIEF:**  Margaret A Nelson, MICHIGAN DEPARTMENT OF ATTORNEY GENERAL, Lansing, Michigan, for Appellants.  Michael R. Dezsi, FIEGER, FIEGER, KENNEY, JOHNSON & GIROUX, Southfield, Michigan, Richard L. Steinberg, Detroit, Michigan, for Appellees.

      GRIFFIN, J., delivered the opinion of the court, in which BOGGS, C. J., joined. MERRITT, J. (pp. 28-34), delivered a separate dissenting opinion.

1

_____

**OPINION**

_____

GRIFFIN, Circuit Judge.  After a panel of judges on the Michigan Court of Appeals reversed a $15 million judgment initially entered in favor of his client, and while the case was pending before the court, attorney Geoffrey Nels Fieger made vulgar comments about the judges on a radio show he hosted.  The Michigan Attorney Grievance Administrator charged Fieger with violating Michigan Rules of Professional Conduct (MRPC) 3.5(c) and 6.5(a), the "courtesy and civility" provisions.  Pursuant to a settlement, Fieger stipulated to a disciplinary reprimand while reserving his rights to challenge the applicability and constitutionality of the rules.  Thereafter, the Michigan Supreme Court upheld the violations and the constitutionality of the rules as applied to Fieger.  *Grievance Adm'r v. Fieger*, 719 N.W.2d 123 (Mich. 2006).

In the present case, Fieger and co-plaintiff Richard Steinberg, Fieger's attorney, challenge the constitutionality of the disciplinary rules on facial grounds.  The United States District Court for the Eastern District of Michigan held that the courtesy and civility provisions violate the First and Fourteenth Amendments to the United States Constitution because the rules are overly broad and vague and enjoined their enforcement.

We vacate the judgment of the district court and remand with instructions to dismiss the complaint for lack of jurisdiction. We hold that Fieger and Steinberg lack standing because they have failed to demonstrate actual present harm or a significant possibility of future harm based on a single, stipulated reprimand; they have not articulated, with any degree of specificity, their intended speech and conduct; and they have not sufficiently established a threat of future sanction under the narrow construction of the challenged provisions applied by the Michigan Supreme Court.  For these same reasons, we also hold that the district court abused its discretion in entering declaratory relief.

I.

The facts are set forth by the Michigan Supreme Court in 719 N.W.2d at 129-31:

In 1997, a jury in the Oakland Circuit Court returned a $15 million verdict in a medical malpractice action in which [attorney Geoffrey] Fieger represented the plaintiff Salvatore Badalamenti. On appeal, the defendants hospital and physician claimed that the verdict was based on insufficient evidence and that they had been denied their constitutional right to a fair trial by Mr. Fieger's intentional misconduct. After hearing argument, a three-judge panel of the Court of Appeals, Jane Markey, Richard Bandstra, and Michael Talbot, unanimously ruled on August 20, 1999, that the defendants were entitled to judgment notwithstanding the verdict because the plaintiff had failed to provide legally sufficient evidence that would justify submitting the case to the jury. [*Badalamenti v. William Beaumont Hosp.-Troy*, 602 N.W.2d 854 (1999).] The panel also held that Mr. Fieger's repeated misconduct by itself would have warranted a new trial. In particular, the Court of Appeals indicated that Mr. Fieger (1) without any basis in fact, accused defendants and their witnesses of engaging in a conspiracy, collusion, and perjury to cover up malpractice, (2) asserted without any basis in fact that defense witnesses had destroyed, altered, or suppressed evidence, and (3) insinuated without any basis in fact that one of the defendants had abandoned the plaintiff's medical care to engage in a sexual tryst with a nurse. The panel described Mr. Fieger's misconduct as "truly egregious" and "pervasive" and concluded that it "completely tainted the proceedings." *Id*. at [860].

Three days later, on August 23, 1999, Mr. Fieger, in a tone similar to that which he had exhibited during the *Badalamenti* trial and on his then-daily radio program in Southeast Michigan, continued by addressing the three appellate judges in that case in the following manner, "Hey Michael Talbot, and Bandstra, and Markey, I declare war on you. You declare it on me, I declare it on you. Kiss my ass, too." Mr. Fieger, referring to his client, then said, "He lost both his hands and both his legs, but according to the Court of Appeals, he lost a finger. Well, the finger he should keep is the one where he should shove it up their asses."

Two days later, on the same radio show, Mr. Fieger called these same judges "three jackass Court of Appeals judges." When another person involved in the broadcast used the word "innuendo," Mr. Fieger stated, "I know the only thing that's in their endo should be a large, you know, plunger about the size of, you know, my fist." Finally, Mr. Fieger said, "They say under their name, 'Court of Appeals Judge,' so anybody that votes for them, they've changed their name from, you know, Adolf Hitler and Goebbels, and I think–what was Hitler's–Eva Braun, I think it was, is now Judge Markey, she's on the Court of Appeals."

Subsequently, Mr. Fieger filed a motion for reconsideration before the same panel. After that motion was denied, this Court denied Mr. Fieger's application for leave to appeal on March 21, 200[1]. [*Badalamenti v. William Beaumont Hosp.-Troy*, 624 N.W.2d 186 (2001).]

On April 16, 2001, the Attorney Grievance Commission (AGC), through its Grievance Administrator, filed a formal complaint with the ADB [Attorney Discipline Board], alleging that Mr. Fieger's comments on August 23 and 25, 1999, were in violation of several provisions of the Michigan Rules of Professional Conduct, including MRPC 3.5(c), MRPC 6.5(a), and MRPC 8.4(a) and (c). While the complaint was pending, the parties entered into a stipulation. In return for Mr. Fieger's agreement not to contest that his remarks had violated MRPC 3.5(c) and MRPC 6.5(a), the charges alleging a violation of MRPC 8.4(a) and (c) would be dismissed. The parties further stipulated the sanction of a reprimand. The agreement was specifically conditioned on Mr. Fieger's being allowed to argue on appeal, while the discipline was stayed, both the applicability and the constitutionality of MRPC 3.5(c) and MRPC 6.5(a).[1] Mr. Fieger maintained that the rules were inapplicable because his remarks were made after the case was completed and were not made in a courtroom. Further, he maintained that the two rules were unconstitutional because they infringed his First Amendment rights.

On appeal to the ADB, with one member recused, the remaining eight members of the ADB issued three opinions. The lead opinion, signed by board members Theodore J. St. Antoine, William P. Hampton, and George H. Lennon, concluded that MRPC 3.5(c) and MRPC 6.5(a) did not apply to Mr. Fieger's comments because they were made outside the courtroom in a case they regarded as completed. They further observed that, if the rules did apply, then they were in violation of the First Amendment. A second opinion, signed by members Lori McAllister and Billy Ben Baumann, agreed that Mr. Fieger's comments were protected by the First Amendment, but dissented from the lead opinion's conclusion that the rules only apply to remarks made within the courtroom. A third opinion, agreeing in part with the second opinion, and signed by members Marie E. Martell, Ronald L. Steffens, and Ira Combs, Jr., held that Mr. Fieger's remarks, even though made outside the courtroom, were prohibited by the rules, and that the remarks were not protected by the First Amendment.

The sum of all this was that a majority (albeit not the same majority for each issue) concluded that the two rules applied to Mr. Fieger's

---

[1]MRPC 3.5(c) provides that a lawyer shall not "engage in undignified or discourteous conduct toward the tribunal." MRPC 6.5(a) provides that "[a] lawyer shall treat with courtesy and respect all persons involved in the legal process." Both rules, collectively, are known as the "courtesy and civility" provisions.

out-of-court statements, while a different majority concluded that those rules were in violation of the First Amendment.

The AGC, through its Grievance Administrator, sought leave to appeal in this Court. We granted leave to appeal to consider whether the remarks by Mr. Fieger, although uncontestedly discourteous, undignified, and disrespectful, nevertheless did not warrant professional discipline because they were made outside the courtroom and after the Court of Appeals had issued its opinion. We also granted leave to appeal to consider whether the ADB possesses the authority to decide issues of constitutionality and whether the two rules in question are constitutional.[7]

---

[7]696 N.W.2d 703 (2005). Mr. Fieger then filed a notice of removal on June 8, 2005, removing the case to federal court. Because Mr. Fieger could not "meet his burden to show removal is proper," the federal district judge granted the Grievance Administrator's motion to remand the case back to this Court on October 19, 2005. *Griev. Adm'r*, 409 F. Supp. 2d 858, 865 (E.D. Mich. 2005). Mr. Fieger appealed to the Sixth Circuit Court of Appeals. On March 10, 2006, the Sixth Circuit summarily affirmed the district court, concluding that "there is no conceivable basis to support removal of the action" under 28 U.S.C. § 1443(1). Unpublished order, entered March 10, 2006 (Docket No. 05-2572).

---

The Michigan Supreme Court reversed the decision of the ADB. *Id*. at 145. The court first clarified that MRPC 3.5(c) and MRPC 6.5(a) were not designed to "silence," "censor," or "prohibit criticism"; rather, the provisions were intended to prohibit only "undignified," "discourteous," and "disrespectful" conduct or remarks. *Id*. at 135. The court then concluded that Fieger violated MRPC 3.5(c) and MRPC 6.5(a) because his speech and conduct concerned a "pending" case and were directed "toward the tribunal." *Id*. at 136-38. Finally, the court rejected Fieger's characterization of the speech as political speech or public-figure comment and held that MRPC 3.5(c) and MRPC 6.5(a) were not unconstitutionally vague. *Id*. at 139-44. The United States Supreme Court denied Fieger's petition for writ of certiorari. 127 S. Ct. 1257 (2007).

Before the Michigan Supreme Court released its opinion, Fieger and co-plaintiff Richard Steinberg, Fieger's attorney, filed suit under the Declaratory Judgment Act, 28

U.S.C. § 2201(a),[2] in the United States District Court for the Eastern District of Michigan. In their federal suit, plaintiffs neither challenged the Michigan Supreme Court's determination that the courtesy and civility rules were constitutional as applied to Fieger's conduct and speech, nor sought to vacate the reprimand imposed on Fieger; rather, plaintiffs raised facial challenges to the courtesy and civility provisions. Specifically, plaintiffs asserted that the rules violate the First and Fourteenth Amendments to the United States Constitution because, allegedly, they (1) unconstitutionally abridge freedom of speech and expression, (2) do not further a compelling government interest, (3) are not the least restrictive means to further a government interest, and (4) are unconstitutionally vague and overly broad. Plaintiffs requested declaratory relief and entry of an injunction preventing enforcement of MRPC 3.5(c) and MRPC 6.5(a).

The district judge granted plaintiffs' request for declaratory relief, concluding that MRPC 3.5(c) and MRPC 6.5(a), as construed by the Michigan Supreme Court in *Fieger*, are unconstitutionally vague and overly broad and enjoined their enforcement. The Michigan Supreme Court and four of its justices timely appeal.[3]

## II.

As a preliminary matter, we note that a claimant who makes a facial attack on a law is requesting "strong medicine." *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973). "[F]ederal courts do not lightly uphold facial challenges" because such efforts do not seek to invalidate laws in concrete, factual settings but to "leave nothing standing." *Warshak v. United States*, 532 F.3d 521, 528 (6th Cir. 2008) (en banc). Further, "[c]laims of facial invalidity often rest on speculation[,] . . . raise the risk of premature interpretation[,] . . . run contrary to the fundamental principle of judicial restraint[,]

---

[2]28 U.S.C. § 2201(a) permits, "[i]n a case of actual controversy within its jurisdiction, . . . "any court of the United States, upon the filing of an appropriate pleading," to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." The statute further provides that "[a]ny such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such."

[3]The district court entered a judgment dismissing the three justices who dissented from the Michigan Supreme Court decision.

. . . [and] threaten to short-circuit the democratic process." *Wash. State Grange v. Wash. State Republican Party*, 128 S. Ct. 1184, 1191 (2008) (citations omitted). For these reasons, facial invalidation of a statute is a remedy that courts employ "sparingly and only as a last resort." *Broadrick*, 413 U.S. at 613.

Moreover, to succeed on their overbreadth challenge, plaintiffs bear a heavy burden. They must demonstrate that "the statute's overreach is *substantial*, not only as an absolute matter, but judged in relation to the statute's plainly legitimate sweep . . . ." *Bd. of Trs. v. Fox*, 492 U.S. 469, 484-85 (1989) (internal quotations and citation omitted).

Against this background, we doubt that plaintiffs would be successful on the merits of their claim. However, we do not decide the merits because plaintiffs lack standing to assert their claim.

III.

A.

Article III of the United States Constitution "does not extend the 'judicial power' to any legal question, wherever and however presented, but only to those legal questions presented in 'Cases' and Controversies.'" *Warshak*, 532 F.3d at 525 (quoting U.S. CONST., art. III, § 2).[4] In recognition of the Constitution's limit on judicial authority, the Declaratory Judgment Act, 28 U.S.C. § 2201(a), permits a court to enter declaratory relief only "[i]n a case of actual controversy . . . ." Article III's "case and controversy" requirement is not satisfied, and a court therefore has no jurisdiction, when the claimant lacks standing, that is, "a sufficiently concrete and redressable interest in the dispute."

---

[4]Art. III, § 2, cl. 1 provides:

The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority; –to all Cases affecting Ambassadors, other public Ministers and Consuls; –to all Cases of admiralty and maritime Jurisdiction; –to Controversies to which the United States shall be a Party; –to Controversies between two or more States; –between a State and Citizens of another State; –between Citizens of different States; –between Citizens of the same State claiming Lands under Grants of different States, and between a State, or the Citizens thereof, and foreign States, Citizens or Subjects.

*Warshak*, 532 F.3d at 525. Thus, "[s]tanding is the 'threshold question in every federal case.'" *Grendell v. Ohio Supreme Court*, 252 F.3d 828, 832 (6th Cir. 2001) (quoting *Coyne v. Am. Tobacco Co.*, 183 F.3d 488, 494 (6th Cir. 1999)).

Whether a party has standing is a question of law that we review de novo. *United Steelworkers of Am. v. Cooper Tire & Rubber Co.*, 474 F.3d 271, 277 (6th Cir. 2007). While litigation based on hypotheticals is disfavored, it is allowed under certain circumstances in the First Amendment context. *Broadrick* , 413 U.S. at 612 (1973). "Litigants . . . are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Id*.

Despite the relaxed approach to standing in a First Amendment case, the overbreadth doctrine does not eviscerate the standing requirement, which is a *constitutional* mandate that is "absolute" and "irrevocable." *Prime Media, Inc. v. City of Brentwood*, 485 F.3d 343, 349-50 (6th Cir. 2007) (citing *Warth v. Seldin,* 422 U.S. 490, 500 (1975)). Indeed, "[t]he Supreme Court has made clear that the injury in fact requirement still applies to overbreadth claims under the First Amendment." *Prime Media*, 485 F.3d at 350 (citing *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 392-93 (1988) (holding that "[t]o bring a cause of action in federal court requires that plaintiffs establish at an irreducible minimum an injury in fact; that is, there must be some threatened or actual injury resulting from the putatively illegal action."); *Sec'y of State of Maryland v. Joseph H. Munson Co., Inc.*, 467 U.S. 947, 958 (1984) ("The crucial issues [for overbreadth standing] are whether [the plaintiff] satisfies the requirement of injury-in-fact, and whether [the plaintiff] can be expected satisfactorily to frame the issues in the case.").

"The burden of establishing standing is on the party seeking federal court action." *Rosen v. Tenn. Comm'r of Fin. & Admin.*, 288 F.3d 918, 927 (6th Cir. 2002) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561-62 (1992)). To satisfy the Constitution's standing requirement, a party must establish that:

(1) he or she has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. In the context of a declaratory judgment action, allegations of past injury alone are not sufficient to confer standing. The plaintiff must allege and/or demonstrate actual present harm or a significant possibility of future harm.

*Fieger v. Ferry*, 471 F.3d 637, 643 (6th Cir. 2006) (internal citations and quotation marks omitted).

Fieger presents two arguments in support of his contention that he has standing to make facial challenges to MRPC 3.5(c) and MRPC 6.5(a). First, he asserts that he suffers actual present harm because the courtesy and civility rules and the threat of discipline for violating them have "chilled" his speech and conduct. Second, he contends that he suffers a significant possibility of future harm because he has twice been subjected to disciplinary proceedings under the rules. Steinberg contends that he has standing to contest the constitutionality of the courtesy and civility rules because "[s]ince the Michigan Supreme Court released its opinion . . . , Steinberg has, for the most part, ceased publishing comment publicly critical of the Court." None of these arguments, however, is sufficient to confer standing on either plaintiff in this case.

B.

In *Morrison v. Board of Education*, 521 F.3d 602 (6th Cir. 2008), we observed that "the Supreme Court is emphatic: 'Allegations of a subjective "chill" are not an adequate substitute for a claim of *specific present objective* harm or a threat of *specific future* harm.'" *Id*. at 608 (quoting *Laird v. Tatum*, 408 U.S. 1, 13-14 (1972)) (emphasis added). We also noted that "absent proof of a concrete harm, where a First Amendment plaintiff only alleges inhibition of speech, the federal courts routinely hold that no standing exists." *Id*. at 609 (citations omitted). In *Morrison*, we articulated why an allegation of "chill," by itself, is insufficient to establish standing in a First Amendment case:

In *Adult Video Ass'n v. United States Department of Justice*, 71 F.3d 563 (6th Cir. 1995), we explained that First Amendment chill typically constitutes the "*reason* why the governmental imposition is invalid rather than . . . the harm which entitles [a party] to challenge it." *Id.* at 566 (quoting *United Presbyterian Church* [*in the U.S.A. v. Reagan*], 738 F.2d [1375, []1378 [(1984)]). This understanding of chill comports with the underlying rationales of intersecting First Amendment doctrines. For example, the doctrine of overbreadth relies on a "chill" theory to permit a litigant – who *already has standing* by virtue of demonstrating a concrete harm – to challenge a rule that may only affect others. *See Midwest Media Prop., L.L.C. v. Symmes Twp.*, 503 F.3d 456, 463 (6th Cir. 2007) ("[O]verbreadth does not excuse a party's failure to 'allege an injury arising from the specific rule being challenged . . . .'" (quoting *Prime Media, Inc. v. City of Brentwood*, 485 F.3d 343, 351 (6th Cir. 2007))); *United Presbyterian Church*, 738 F.2d at 1379 ("It is only in this . . . respect that 'chilling effect' has anything to do with the doctrine of standing:  It permits a person, who has standing to challenge governmental action because of the concrete harm it causes him, to assert a deficiency which may not affect him but only others."). In order to have standing, therefore, a litigant alleging chill must still establish that a concrete harm – i.e., enforcement of a challenged statute – occurred or is imminent. *See Am. Library Ass'n v. Barr*, 956 F.2d 1178, 1193 (D.C. Cir. 1992) ("[W]hether plaintiffs have standing . . . depends on how likely it is that the government will attempt to use these provisions against them . . . and not on how much the prospect of enforcement worries them.").

*Id.* at 609-10.

Morrison was a high school student and a Christian who believed that his faith required him to tell students who were homosexual that their sexual conduct was a sin. *Id.* at 605. The high school had a written policy, however, that prohibited students from derogating other students on the basis of their sexual orientations. *Id.* "Wary of potential punishment, Morrison remained silent with respect to his personal beliefs, but challenged in federal court the Board's right to stifle his speech." *Id.* After filing his lawsuit, the school board revised its policy and codes of conduct to permit anti-homosexual speech unless it was "sufficiently severe or pervasive that it adversely effects a student's education or creates a climate of hostility or intimidation for that student, both from the perspective of an objective educator and from the perspective of the student at whom the harassment is directed." *Id.* at 607. The sole issue on appeal

was whether Morrison had standing to pursue his claim that the school board's policies had "chilled" his speech. *Id*. at 608. We held that he did not. We explained that:

> The claim at stake here involves Morrison's choice to chill his own speech based on his perception that he would be disciplined for speaking. But whether he would have been so punished, we can only speculate. The school district . . . stated that its former discipline policy regarding instances of harassment or discrimination "shall not be interpreted as applying to speech otherwise protected under the state or federal constitutions where the speech does not otherwise materially or substantially disrupt the educational process." The record is silent as to whether the school district threatened to punish or would have punished Morrison for protected speech in violation of its policy. Morrison asks us, essentially, to find a justiciable injury where his own subjective apprehension counseled him to choose caution and where he assumed – solely on the basis of the Board's 2004-05 policies and without any specific action by the Board – that were he to speak, punishment would result. We decline to do so. Absent a concrete act on the part of the Board, Morrison's allegations fall squarely within the ambit of "subjective chill" that the Supreme Court definitively rejected for standing purposes. *Laird*, 408 U.S. at 13 (quotation marks omitted). Morrison cannot point to anything beyond his own "subjective apprehension and a personal (self-imposed) unwillingness to communicate," *ACLU* [*v. Nat'l Sec. Agency*], 493 F.3d [644,] [] 662 [(6th Cir. 2007)], and those allegations of chill, without more, fail to substantiate an injury-in-fact for standing purposes.

*Id*.

Although the facts in this case differ from those in *Morrison* because the Michigan Supreme Court *has* sanctioned Fieger under MRPC 3.5(c) and MRPC 6.5(a), the outcome remains the same for two reasons. First, unlike Morrison, plaintiffs here make no attempt to articulate, with *any* amount of specificity, their intended speech or conduct. In *Morrison*, we determined that the alleged "chill" was insufficient to constitute an injury-in-fact, despite a specific, unambiguous proffer by Morrison of his intended speech. Morrison intended to convey to homosexual students that their sexual conduct was immoral. Notwithstanding that relatively particularized statement of intention, we concluded that the threat of punishment under the challenged policies was still impermissibly conjectural under a policy that had not been enforced. Here, the converse is present: while the challenged rules have been enforced, plaintiffs fail to

sufficiently articulate their intended speech or conduct.  They make only vague suggestions of a *general* desire to criticize the Michigan judiciary.  They have not presented sufficient facts to demonstrate a threat of sanction arising from their unspecified future criticisms.

Second, the threat of future injury arising from a general desire to criticize the Michigan judiciary is significantly diminished by the narrow construction placed on the courtesy and civility provisions by the Michigan Supreme Court and by the specific factual context in which Fieger was sanctioned.  Like the school board in *Morrison* which determined that its policy would not apply "to speech otherwise protected under the state or federal constitutions where the speech does not otherwise materially or substantially disrupt the educational process[,]" the Michigan Supreme Court emphasized that Fieger violated the rules, not because he criticized judges, but because he made *vulgar, personally abusive* comments about participants in a *pending* case.  Specifically, the court noted that:

> greater restraint . . . is permissible when a case is ongoing than when it is completed.  As the United States Supreme Court said in *Gentile* [*v. State Bar of Nevada*, 501 U.S. 1030, 1070 (1991),] "'When a case is finished, courts are subject to the same criticism as other people, but the propriety and necessity of preventing interference with the course of justice by premature statement, argument or intimidation hardly can be denied.'"  (Citation omitted.)  Accordingly, "the speech of lawyers representing clients in pending cases may be regulated under a less demanding standard than that established for regulation of the press . . . ."  *Id*. at 1074.

*Fieger*, 719 N.W.2d at 135.  In assessing Fieger's speech, the court explained that:

> [t]o call a judge a "jackass," a "Hitler," a "Goebbels," a "Braun" and to suggest that a lawyer is "declar[ing] war" on them and that the judge should "[k]iss [the lawyer's] ass," or should be anally molested by finger, fist, or plunger, is, to say the least, not to communicate information; rather, it is nothing more than *personal abuse*.  We conclude that such coarseness *in the context of an officer of the court participating in a legal proceeding* warrants no First Amendment protection when balanced against this state's compelling interest in maintaining public respect for the integrity of the legal process. *United States v. O'Brien*, 391 U.S. 367, 377 (1968).

*Id*. at 142 (emphasis added).  The defendant justices prudently clarified that MRPC 3.5(c) and MRPC 6.5(a) do not preclude lawyers generally from expressing "disagreement" or "criticism, even strong criticism," of judges.  *Id*. at 143.  Indeed, the court specifically noted that "lawyers have an unquestioned right to criticize the acts of courts and judges."  *Id*. at 144 (citing *In re Estes*, 94 N.W.2d 916 (1959)).  In Fieger's case, however, the court determined that his remarks about participants in a pending legal proceeding were so unambiguously "vulgar and crude" as to be undeserving of constitutional protection. *Fieger*, 719 N.W.2d at 144.  Fieger's outrageous remarks were made during the time allowed to file a motion for reconsideration before the very panel to which the comments were directed, and such a motion was indeed filed in the immediate aftermath of the remarks.

In light of the narrowing construction placed on the rules by the Michigan Supreme Court in *Fieger*, the court's acknowledgment that lawyers have a right to criticize judges generally, and Fieger's extreme remarks about participants in a pending case, for which he stipulated that reprimand was warranted, it is incumbent upon plaintiffs to articulate something more than a generalized, subjective "chilling" of speech to establish the required injury-in-fact.  Specifically, plaintiffs do not suggest that they or any other Michigan attorneys – at present or at any time in the immediate future – intend to make vulgar, crude, or personally abusive remarks about participants in pending cases for which discipline might be threatened under the challenged rules.  *See Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 634 (1980) (noting that although overbreadth permits a litigant whose own activities are unprotected to assert the rights of others not before the court, it still requires that the litigant show that the rights of non-parties have been "substantially abridge[d].").  In fact, plaintiffs do not allege any intended speech or conduct at all.  Thus, the purported "chilling effect" of the rules on plaintiffs and on Michigan attorneys, in light of the narrow construction placed on those rules and Fieger's extreme behavior, is objectively unsubstantiated and, accordingly, fails to give rise to an injury-in-fact.

Fieger's contention that he suffers a significant possibility of future harm because he has twice been subjected to disciplinary proceedings under the rules also does not confer standing upon him in the present case. Initially, we note that Fieger no longer hosts the radio show which served as the medium for his sanctioned comments and that the makeup of the Michigan Supreme Court has changed as a result of the recent election. In addition, we observe that during the hearing on the parties' cross-motions for summary judgment before the district court, Fieger's counsel repeatedly and *inaccurately* stated that Fieger had been charged "numerous" and "several" times under the courtesy and civility provisions. In fact, Fieger eventually conceded at the hearing below, in his brief, and at oral argument that he has only twice been "subjected to disciplinary proceedings" under the provisions.

Upon a thorough examination of the facts surrounding those alleged disciplinary proceedings, we conclude that they do not support an injury-in-fact in the present case. In the most recent disciplinary proceeding, which serves as the backdrop for this case and which arose from Fieger's remarks on his radio show, Fieger admitted that he violated MRPC 3.5(c) and MRPC 6.5(a), stipulated to the sanction of reprimand, and the United States Supreme Court denied review of the Michigan Supreme Court's ruling affirming the sanction and upholding the constitutionality of the courtesy and civility rules. As to the purported second disciplinary proceeding, Fieger's counsel claimed ignorance about its circumstances and relied on information he received from opposing counsel. Opposing counsel stated that "there was a complaint filed," but "I don't believe that there were any formal charges filed against Mr. Fieger in that instance." That Fieger conceded the violation and sanction in the most recent incident and was not charged or sanctioned in the second, combined with his attorney's lack of knowledge about his disciplinary history, preclude us from reasonably extrapolating a "significant possibility" of future injury based on that disciplinary history.[5]

---

[5]This case is thus distinguishable from *Fieger v. Ferry*, in which we ruled that Fieger had standing to challenge the application and constitutionality of Michigan's recusal rule, MCR 2.003. 471 F.3d at 640-41. In that decision, we concluded that because Fieger had served as counsel on approximately 38 cases filed in the Michigan Supreme Court and had $90 million in lawsuit awards pending in the State Court of Appeals, there was a "significant, rather than a remote, possibility that Fieger's present and future cases will someday reach the Michigan Supreme Court." *Id.* at 643. We

Even *when* a party has been unlawfully sanctioned in the past, we have heeded the Supreme Court's directive that "'past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects.'" *Grendell,* 252 F.3d at 832 (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983)).  While previous sanctions might, of course, be "'evidence bearing on whether there is a real and immediate threat of repeated injury' . . . where the threat of repeated injury is speculative or tenuous, there is no standing to seek injunctive relief." *Grendell*, 252 F.3d at 833 (quoting *Lyons*, 461 U.S. at 102).

*Grendell*, a case virtually identical to this case, controls the outcome of this appeal.  *Grendell* involved a facial challenge by an attorney to an attorney disciplinary rule.  Specifically, Grendell argued that Ohio Supreme Court Practice Rule XIV, § 5 unconstitutionally permits the imposition of sanctions without affording notice and the opportunity to be heard, in violation of the Due Process Clause of the Fifth and Fourteenth Amendments to the United States Constitution. *Grendell*, 252 F.3d at 830. The Ohio Supreme Court had sanctioned Grendell under the challenged rule for filing a frivolous lawsuit.  *Id*. at 831.  Grendell then asserted a "general constitutional challenge [to the rule] seeking declaratory and injunctive relief."  *Id*.  Like Fieger, Grendell contended that he had standing to assert a facial challenge to the rule because "the Ohio Supreme Court's power to sanction attorneys . . . continuously exposes [them] to the 'chilling effect' of the hanging of the 'Sword of Damocles' over them." *Id*. at 833 (internal quotations omitted). Also like Fieger, Grendell emphasized that he had been "previously sanctioned" under the challenged rule, *id*. at 832, and even asserted that his "fear of unconstitutionally imposed sanctions forced him to withdraw from two recent cases before the Ohio Supreme Court." *Id*. at 834.

Despite Grendell's claim of the rule's "chilling effect," his alleged injury arising from his withdrawal from two cases because of fear of sanction, and the court's previous sanction of him under the disciplinary rule, we nevertheless held that Grendell lacked

---

determined, therefore, that it was "likely, rather than speculative, that Fieger will again face the recusal issue that he has faced in past cases." *Id*. at 643-44.

standing to assert a facial challenge to the rule. Specifically, we concluded that the threat of future sanction was "highly conjectural, resting on a string of actions the occurrence of which is merely speculative." *Grendell*, 252 F.3d at 833. We explained that:

> to show a palpable threat of future injury necessary to achieve standing for declaratory and injunctive relief, Grendell must present evidence establishing: (1) that he is bringing or highly likely to bring a lawsuit before the Ohio Supreme Court; (2) that such lawsuit is allegedly frivolous, exposing him to sanctions under Rule XIV, § 5; (3) that the Ohio Supreme Court would, in its discretion, impose such sanctions; and (4) that the imposition of those sanctions would violate due process. Such a chain of events is simply too attenuated to establish injury in fact, and to confer the required standing in this case.

*Id.*

Although *Grendell* involved a Fifth Amendment due process challenge, and not a First Amendment challenge, the facts are similar because both cases involve challenges to attorney discipline rules, both attorneys were sanctioned under those rules, and both attorneys alleged "chill" or other harm. Accordingly, our reasoning in *Grendell* is persuasive. Here, paralleling *Grendell*, to show a palpable threat of future injury necessary to achieve standing for declaratory and injunctive relief, plaintiffs must present evidence establishing: (1) that they are now, or highly likely to be, speaking about a pending case; (2) that such speech will concern participants in that case and be vulgar, crude, or personally abusive, exposing them to sanctions under MRPC 3.5(c) or MRPC 6.5(a); (3) that the Michigan Supreme Court would, in its discretion, impose such sanctions; and (4) that the imposition of those sanctions would violate plaintiffs' First Amendment rights. As in *Grendell*, we conclude that such a chain of events is simply too attenuated to establish the injury in fact required to confer standing.

*Grendell* relied on the Supreme Court's decision in *Lyons*. In *Lyons*, the plaintiff sought to enjoin the Los Angeles Police Department ("L.A.P.D.") from using chokeholds, which had caused several injuries and deaths during arrests, including injury to Lyons himself. *Lyons*, 461 U.S. at 97-98, 100. The complaint alleged that the L.A.P.D.,

> "pursuant to the authorization, instruction, and encouragement of Defendant City of Los Angeles, regularly and routinely apply these choke holds in innumerable situations where they are not threatened by the use of any deadly force whatsoever," that numerous persons have been injured as the result of the application of the chokeholds, that Lyons and others similarly situated are threatened with irreparable injury in the form of bodily injury and loss of life, and that Lyons "justifiably fears that any contact he has with Los Angeles Police officers may result in his being choked and strangled to death without provocation, justification or other legal excuse."

*Id*. at 98. Despite the allegations of widespread injury and even though the L.A.P.D. had previously used the chokehold against Lyons himself, the Supreme Court nevertheless held that the future threat of injury was too speculative to support Lyons's standing to challenge the constitutionality of the department's use of chokeholds. *See Grendell*, 252 F.3d at 833 (discussing *Lyons*). In reversing the Ninth Circuit's entry of an injunction prohibiting the use of chokeholds in certain situations, the Court stated:

> Lyons has failed to demonstrate a case or controversy with the City that would justify the equitable relief sought. Lyons' standing to seek the injunction requested depended on whether he was likely to suffer future injury from the use of the chokeholds by police officers. Count V of the complaint alleged the traffic stop and choking incident five months before. That Lyons may have been illegally choked by the police on October 6, 1976, while presumably affording Lyons standing to claim damages against the individual officers and perhaps against the City, does nothing to establish a real and immediate threat that he would again be stopped for a traffic violation, or for any other offense, by an officer or officers who would illegally choke him into unconsciousness without any provocation or resistance on his part. The additional allegation in the complaint that the police in Los Angeles routinely apply chokeholds in situations where they are not threatened by the use of deadly force falls far short of the allegations that would be necessary to establish a case or controversy between these parties.

*Lyons*, 461 U.S. at 105.

Here, the justification for plaintiffs' standing is even less robust than it was for Lyons's standing. Not only had Lyons been injured by the chokehold, *id*. at 97-98, but he also alleged that the L.A.P.D.'s use of the chokehold was pursuant to a policy, regular and routine practice, and even *encouragement*. *Id*. at 98. Neither Fieger nor Steinberg

contends that the Michigan Supreme Court or its investigative disciplinary arm are improperly wielding MRPC 3.5(c) or MRPC 6.5(a) to regularly discipline attorneys for their speech, nor do we find any information in the record to support such an inference. In fact, plaintiffs identify no other attorneys, other than Fieger himself, who have been disciplined under MRPC 3.5(c) or MRPC 6.5(a) for criticizing the Michigan judiciary.

Moreover, plaintiffs do not contend that the attorney disciplinary authorities in Michigan are specifically targeting them for sanction under the challenged rules.[6] In fact, the district court noted that Fieger is "a vocal, often harsh, and at times vulgar critic of Michigan's judiciary." Despite his significant history of criticizing Michigan's judges, it is revealing that Fieger's record consists of a single, isolated reprimand under the challenged provisions. Based on that history, Fieger has failed to demonstrate a reasonable threat of future sanction. *See Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979) (holding that fears of prosecution "that are imaginary or speculative" do not offend free-speech rights).

*Grendell* also relied on *Ashcroft v. Mattis*, 431 U.S. 171 (1977). In that case, the Supreme Court vacated an en banc decision of the Eighth Circuit and remanded the case to the district court with instructions to dismiss the complaint for lack of standing. *Id*. at 173. In *Mattis*, police shot and killed the appellee's eighteen-year old son while the son attempted to escape arrest. *Id*. at 171. The father sought a declaration that the state statute which authorized police to use deadly force in apprehending a person who committed a felony was unconstitutional. *Id*. In support of standing, the complaint alleged that the father "has another son who 'if ever arrested or brought under an attempt at arrest on suspicion of a felony, might flee or give the appearance of fleeing, and would therefore be in danger of being killed by these defendants or other police officers . . . .'" *Id*. at 172 n.2. The Court, however, ruled that "[s]uch speculation is insufficient to establish the existence of a present, live controversy." *Id*. Resisting the urge to resolve

---

[6]The absence of such allegations again distinguishes this case from *Fieger v. Ferry*, in which Fieger alleged in his complaint that the justices on the Michigan Supreme Court were "actively pursuing disciplinary proceedings against him before the Attorney Grievance Commission." 471 F.3d at 640.

the merits of the appeal and instead obeying its constitutional mandate, as we do now, the Court stated:

> Although we are urged to consider the merits of the Court of Appeals' holding, we are unable to do so, because this suit does not now present a live "case or controversy." This suit was brought to determine the police officers' liability for the death of appellee's son. That issue has been decided, and there is no longer any possible basis for a damages claim. Nor is there any possible basis for a declaratory judgment. For a declaratory judgment to issue, there must be a dispute which calls, not for an advisory opinion upon a hypothetical basis, but for an adjudication of present right upon established facts. Here, . . . appellee's primary claim of a present interest in the controversy is that he will obtain emotional satisfaction from a ruling that his son's death was wrongful. Emotional involvement in a lawsuit is not enough to meet the case-or-controversy requirement . . . .

*Id*. at 172-73.

The *Mattis* Court's holding as to the proper method of consideration of constitutional issues is emphasized by the fact that eight years later, in *Tennessee v. Garner*, 471 U.S. 1 (1985), the Supreme Court decided, in a concrete context, exactly the issue that could have been before them in *Mattis*, by holding that indeed it was unconstitutional to use deadly force to apprehend a person who simply had committed a felony. *Id*. at 3. Just as *Garner* ultimately decided in a concrete situation the abstract controversy that was not properly before the Court in *Mattis*, this controversy must await proper jurisdiction for resolution.

As in *Mattis*, we do not ignore the context in which this case has arisen. Although plaintiffs seek a declaration that the courtesy and civility provisions are unconstitutional on their face, that request springs, not from a vacuum, but from an adverse determination by Michigan's highest court of which the United States Supreme Court denied review. We remind plaintiffs that the court's judgment is not the subject of this appeal because, consistent with *Mattis*, "[t]hat issue has been decided . . . ." *Id*. at 172. Nevertheless, Fieger, like the plaintiff in *Mattis*, attempts to accomplish through the back door what he could not through the front – invalidation of the very rules that he admittedly violated. In this way, Fieger's primary objective resembles that of the

plaintiff in *Mattis*: to re-litigate the disciplinary proceedings in Michigan, but this time in federal court. Fieger invites us to void the rules he violated based on sheer speculation of future discipline. We decline the invitation.

### C.

None of the cases upon which plaintiffs or the district court relied support plaintiffs' standing to assert a facial challenge to MRPC 3.5(c) and MRPC 6.5(a). In *Steffel v. Thompson*, 415 U.S. 452 (1974), police twice warned the plaintiff and his companion to stop distributing handbills on an exterior sidewalk of a shopping center in protest of American involvement in the Vietnam War. *Id*. at 455. Police threatened to arrest plaintiff and his companion if they did not cease. *Id*. Plaintiff left to avoid arrest. *Id*. Plaintiff's companion, however, continued distributing handbills, and police arrested him and charged him with violating a Georgia criminal trespass statute. *Id*. at 455-56. Plaintiff, although desiring to return to the shopping center to distribute handbills, had not done so because he feared that police would arrest him as well. *Id*. at 456. "[T]he parties stipulated that, if [plaintiff] returned and refused upon request to stop handbilling, a warrant would be sworn out and he might be arrested and charged with a violation of the Georgia statute." *Id*.

In reversing the Fifth Circuit's judgment affirming the district court's dismissal of the complaint on the basis that no case and controversy had arisen, the Supreme Court stated:

> Unlike three of the appellees in *Younger v. Harris*, 401 U.S. [37,] [] 41 [(1971)], petitioner has alleged threats of prosecution that cannot be characterized as "imaginary or speculative," *id*., at 42. He has been twice warned to stop handbilling that he claims is constitutionally protected and has been told by the police that if he again handbills at the shopping center and disobeys a warning to stop he will likely be prosecuted. The prosecution of petitioner's handbilling companion is ample demonstration that petitioner's concern with arrest has not been "chimerical," *Poe v. Ullman*, 367 U.S. 497, 508 (1961). In these circumstances, it is not necessary that petitioner first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights. *See, e.g., Epperson*

> *v. Arkansas*, 393 U.S. 97 (1968).  Moreover, petitioner's challenge is to
> those specific provisions of state law which have provided the basis for
> threats of criminal prosecution against him.  *Cf. Boyle v. Landry*, 401
> U.S. 77, 81 (1971);  *Watson v. Buck*, 313 U.S. 387, 399-400 (1941).

*Id.* at 459.

*Steffel* is readily distinguishable from this case.  The plaintiff in *Steffel*, unlike plaintiffs here, was unambiguous in his intended speech – distributing handbills in a shopping center.  Further, the threat of injury in *Steffel*, unlike the threat of injury here, was concrete and imminent – the police had arrived and threatened to arrest plaintiff and charge him with criminal trespass.  Police even *stipulated* that they would do so.  Here, plaintiffs merely assert that they feel "inhibited," improperly discount the conduct which led to the reprimand, assert a nebulous desire to criticize Michigan's judiciary without considering the impact of the narrow construction of the challenged rules articulated by the Michigan Supreme Court, and then speculate about the possible result of their conduct.  Fieger has not acted analogously to the plaintiff in *Steffel* by, for example, unambiguously alleging that he plans to or wishes to make a similar or identical speech about some recent case he has lost or specifically intends to use the same language in the event that he loses any of a number of specific pending cases.  His allegations are simply insufficient to confer standing.

*MedImmune, Inc. v. Genentech*, *Inc.*, 127 S. Ct. 764 (2007), another case relied upon by plaintiffs and the district court, is also distinguishable.  In *Genentech*, a patent licensee paid royalties that it did not believe it owed because had it refused, it would have exposed itself to treble damages, attorney's fees, and an injunction prohibiting it from selling a product that accounted for more than eighty percent of its sales revenue.  *Id.* at 767-68.  The Federal Circuit affirmed the district court's conclusion that because the licensee had paid the royalties, albeit under protest, such payment extinguished the case and controversy and prohibited entry of a declaratory judgment.  *Id.* at 768.  The Supreme Court reversed and held that Article III's case-or-controversy requirement, as reflected in the "actual controversy" requirement of the Declaratory Judgment Act, did not require the licensee to terminate its license agreement, breach the agreement, or

expose itself to legal repercussions before it could seek a declaratory judgment that the underlying patent was invalid, unenforceable, or not infringed. *Id*. at 767. Writing for the Court, Justice Scalia stated:

> Our analysis must begin with the recognition that, where threatened action by *government* is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat – for example, the constitutionality of a law threatened to be enforced. The plaintiff's own action (or inaction) in failing to violate the law eliminates the imminent threat of prosecution, but nonetheless does not eliminate Article III jurisdiction.

*Id*. at 772. In other words, a plaintiff need not "bet the farm, so to speak, by taking the violative action." *Id*.

We agree that the purpose of the Declaratory Judgment Act is to ameliorate the dilemma posed by "putting the challenger to the choice between abandoning his rights or risking prosecution." *Id*. at 773 (citing *Abbott Labs. v. Gardner*, 387 U.S. 136, 152 (1967)). However, the Declaratory Judgment Act does not trump the Constitution. Plaintiffs ignore the Supreme Court's crucial observation in *Genentech* that:

> There is no dispute that [the case and controversy] standards would have been satisfied if petitioner had taken the final step of refusing to make royalty payments under the 1997 license agreement. Respondents claim a right to royalties under the licensing agreement. Petitioner asserts that no royalties are owing because the Cabilly II patent is invalid and not infringed; and alleges (without contradiction) a threat by respondents to enjoin sales if royalties are not forthcoming. *The factual and legal dimensions of the dispute are well defined and, but for petitioner's continuing to make royalty payments, nothing about the dispute would render it unfit for judicial resolution.*

*Id*. at 771-72 (emphasis added). Thus, *Genentech*, like *Steffel*, involved a "well defined" dispute appropriate for judicial resolution. Plaintiff's intended conduct in *Genentech* – making or refusing to make royalty payments under an agreement – was obvious and the threat of injury was imminent and concrete. Here, plaintiffs make vague, non-specific allegations of their intended speech and conduct under an attorney discipline rule that has been applied to extreme conduct and narrowed by construction. They then speculate that injury will result from merely criticizing the Michigan judiciary. In that context,

future injury is conjectural, and the "dispute" is amorphous, rendering it "unfit for judicial resolution."

*Freedman v. Maryland*, 380 U.S. 51 (1965), involved a constitutional challenge to a state motion picture censorship statute arising from an appeal from a criminal conviction for violating that statute. *Id.* at 52. In reversing the state court's conclusion that the appellant lacked standing to assert his constitutional claim, the Supreme Court stated: "Appellant has not challenged the submission requirement in a vacuum but in a *concrete* statutory context." *Id.* at 56 (emphasis added). The Court explained:

> In substance, [appellant's] argument is that, because the apparatus [of censorship] operates in a statutory context in which judicial review may be too little and too late, the Maryland statute lacks sufficient safeguards for confining the censor's action to judicially determined constitutional limits . . . ."

*Id.* at 57. Thus, *Freedman*, like *Steffel* and *Genentech*, involved a concrete dispute.

In *Dombrowski v. Pfister*, 380 U.S. 479 (1965), the Supreme Court concluded that plaintiffs had standing to challenge the constitutionality of Louisiana's Subversive Activities and Communist Control Law in the midst of a criminal prosecution for violating that law because the government exploited the statute for improper purposes, namely, to target and harass them. *Id.* at 482. The complaint, *supported* by affidavits and a written offer of proof, alleged that:

> the threats to enforce the statutes against appellants are not made with any expectation of securing valid convictions, but rather are part of a plan to employ arrests, seizures, and threats of prosecution under color of the statutes to harass appellants and discourage them and their supporters from asserting and attempting to vindicate the constitutional rights of Negro citizens of Louisiana.

*Id.* The Court noted that, despite a prior criminal proceeding in which a state judge quashed the arrest warrants because they were not based on probable cause, discharged the appellants, and then granted a motion to suppress seized evidence because a raid against appellants' offices was illegal, "Louisiana officials continued, however, to threaten prosecution of the appellants . . . ." *Id.* at 488. Appellants then filed their action

seeking declaratory and injunctive relief. *Id*. A state judge entered a temporary restraining order prohibiting prosecutions under the statute pending a hearing and decision by the district court. *Id*. When the district court dissolved the temporary restraining order and dismissed the complaint for failure to state a claim upon which relief could be granted and on abstention grounds, a grand jury then returned indictments against the individual appellants under the statute. *Id*.

In concluding that the complaint alleged "sufficient injury to justify equitable relief" and that the district court erred in dismissing it, the Court explained:

> These events, together with repeated announcements by appellees that the appellant organization is a subversive or Communist-front organization, whose members must register or be prosecuted under the Louisiana statutes, have, appellants allege, frightened off potential members and contributors. Seizures of documents and records have paralyzed operations and threatened exposure of the identity of adherents to a locally unpopular cause. Although the particular seizure has been quashed in the state courts, the continuing threat of prosecution portends further arrests and seizures, some of which may be upheld and all of which will cause the organization inconvenience or worse.
>
> . . .
>
> Not only does the complaint allege far more than an "injury other than that incidental to every criminal proceeding brought lawfully and in good faith," but appellants allege threats to enforce statutory provisions other than those under which indictments have been brought. Since there is no immediate prospect of a final state adjudication as to those other sections – if, indeed, there is any certainty that prosecution of the pending indictments will resolve all constitutional issues presented – a series of state criminal prosecutions will not provide satisfactory resolution of constitutional issues.

*Id*. at 488-89 (citations omitted). Further, the Court determined that the district court erred in abstaining from adjudication pending authoritative interpretation of the statutes by Louisiana's courts, explaining:

> First, appellants have attacked the good faith of the appellees in enforcing the statutes, claiming that they have invoked, and threaten to continue to invoke, criminal process without any hope of ultimate success, but only to discourage appellants' civil rights activities.

. . .

> [A]n interpretation rendering the statute inapplicable . . . would merely mean that appellants might ultimately prevail in the state courts. It would not alter the impropriety of appellees' invoking the statute in bad faith to impose continuing harassment in order to discourage appellants' activities, as appellees allegedly are doing and plan to continue to do.

> Second, appellants have challenged the statutes as overly broad and vague regulations of expression. We have already seen that where, as here, prosecutions are actually threatened, this challenge, if not clearly frivolous, will establish the threat of irreparable injury required by traditional doctrines of equity.

*Id*. at 490-91 (citations omitted).

Again, the case before us is clearly distinguishable from *Dombrowski* for two reasons. First, this case does not arise in the midst of a criminal prosecution or disciplinary proceeding. Neither Fieger nor Steinberg is currently being threatened with discipline under the courtesy and civility rules. Second, we again emphasize that plaintiffs make no allegation and have not provided any evidence to support an inference that the Michigan Supreme Court is targeting them, harassing them, or broadly applying the courtesy and civility provisions to Michigan's attorney population for the purpose of stifling fundamental freedoms. If that were the case, Fieger presumably would have a lengthy disciplinary record and would have asserted such allegations during his disciplinary proceeding in an effort to convince a federal court to hear the case without abstaining.[7] For these reasons, plaintiffs have not presented an injury in fact.

---

[7]*Dombrowski* demonstrates why plaintiffs are incorrect in their assertion that:

> [t]o argue that Plaintiffs do not have standing to challenge the "courtesy" provisions would result in an intolerable trick. The trick begins by arguing that Plaintiffs do not have standing to prospectively challenge the "courtesy" provisions of the rules as unconstitutional because there is no pending grievance or proceeding against Mr. Fieger. But if there was a pending grievance or proceeding, Defendant would assuredly assert (and have successfully asserted in this case) that the Court must abstain from deciding Plaintiffs' claims. By arguing lack of standing together with abstention, Defendants are asking the Court to lock the doors to the courthouse; for there would *never, ever* be jurisdiction under such circumstances.

Adopting plaintiffs' argument, the district court stated:

> It should also be noted that if this Court were to adopt Defendants' standing argument, Plaintiffs would be stuck in a procedural rabbit hole that would result in Plaintiffs being forever precluded from possessing the requisite standing required for federal review.

IV.

For the same reasons already articulated, we also conclude that the district court abused its discretion in entering a declaratory judgment under the Declaratory Judgment Act. *See Scottsdale Ins. Co. v. Roumph*, 211 F.3d 964, 967 (6th Cir. 2000) ("This court reviews the district court's exercise of discretion under the Declaratory Judgment Act, 28 U.S.C. § 2201(a), for abuse of discretion.").

> Since its inception, the Declaratory Judgment Act has been understood to confer on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants. On its face, the statute provides that a court "*may* declare the rights and other legal relations of any interested party seeking such declaration[.]" The statute's textual commitment to discretion, and the breadth of leeway we have always understood it to suggest, distinguish the declaratory judgment context from other areas of the law in which concepts of discretion surface . . . . When all is said and done, we have concluded, "*the propriety of a declaratory relief in a particular case will depend upon a circumspect sense of its fitness informed by the teachings and experience concerning the functions and extent of federal judicial power*."

*Roumph*, 211 F.3d at 969 (quoting *Wilton*, 515 U.S. at 286-87)) (citations omitted) (emphasis added). The present filing, which involves "a close nexus between the underlying factual and legal issues and state law and/or public policy," *id.* at 968 (citing *Wilton v. Seven Falls Co.*, 515 U.S. 277 (1995)), is, absent a proper injury in fact and circumstances suggestive of illegitimate exercises of authority by the Michigan Supreme

---

When Plaintiffs first raised the facial challenge to the courtesy provisions at a time when a state grievance was pending, Defendants argued that abstention was required. This Court agreed. Now that the proceeding is not pending, Defendants claim that Plaintiffs lack standing to prospectively challenge the provisions because there is no pending grievance or proceeding. At oral argument, Defendants were asked repeatedly if there would ever be a situation where a plaintiff would possess the requisite standing to facially challenge the courtesy provisions in a federal court . . . . Defendants' response [was] too limited and would likely cause issues concerning the existence of an actual case or controversy to arise.

*Dombrowski* proves that, under a proper set of facts, a plaintiff alleging a violation of the federal Constitution in a pending state grievance or other proceeding *could* have standing and that a federal court would be *required* to intervene in the proceeding without abstaining. Indeed, the Supreme Court in *Dombrowski* remanded the case to the district court and ordered it to determine the issues raised in the complaint without abstaining. *Dombrowski*, 380 U.S. at 497-98. Further, 28 U.S.C. § 1257(a) authorizes the Supreme Court to review a final judgment or decree rendered by the highest court of a state where the validity of a state statute is drawn into question on the ground of its being repugnant to the Constitution of the United States. In this case, federal intervention has simply not been justified. That is not to say, however, that under an appropriate set of facts, federal court jurisdiction would not be proper.

Court under the federal Constitution, a case that would "increase the friction between our federal and state courts and improperly encroach on state jurisdiction." *Roumph*, 211 F.3d at 968.

V.

We hold that plaintiffs lack standing to assert a facial challenge to MRPC 3.5(c) and 6.5(a) because they have failed to demonstrate actual present harm or a significant possibility of future harm based on a single, stipulated reprimand. Moreover, plaintiffs have not articulated, with any degree of specificity, their intended speech and conduct and have not sufficiently established a threat of future sanction under the narrow construction of the challenged provisions by the Michigan Supreme Court. For the same reasons, we conclude that the district court abused its discretion in entering declaratory relief under the Declaratory Judgment Act, 28 U.S.C. § 2201(a).[8]

Accordingly, the judgment of the district court is vacated, and the case is remanded to the United States District Court for the Eastern District of Michigan with instructions to dismiss the complaint for lack of jurisdiction.

---

[8]In view of our disposition, it is unnecessary for us to address the additional issues raised by appellants.

—————————

## DISSENT

—————————

MERRITT, Circuit Judge, dissenting. Rule 3.5(c) of the Michigan Rules of Professional Conduct provides that a lawyer shall not "engage in undignified or discourteous conduct toward the tribunal." Rule 6.5(a) provides that "a lawyer shall treat with courtesy and respect all persons involved in the legal process." No other jurisdiction places such potentially sweeping restrictions on attorney speech.[1] Plaintiffs Geoffrey Fieger and Richard Steinberg brought suit under the Declaratory Judgment Act, 28 U.S.C. § 2201(a), seeking a declaration that these "courtesy and civility" provisions are unconstitutionally vague and overbroad. The district court concluded that the suit presented an actual controversy that would be appropriately resolved by issuing declaratory relief. The majority now reverses both of those decisions. Because I believe that the requirements for standing under the Declaratory Judgment Act require a different result, I respectfully dissent.

The majority first errs by falsely claiming that these Rules are narrow and that the Michigan Supreme Court has given the Rules an even narrower construction. The majority opinion also completely fails to understand that the recent case of *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007), clearly establishes the proposition that, in free-speech cases brought under the Declaratory Judgment Act, credible threats of *governmental* suppression create standing for individuals who face a realistic danger of prosecution.

—————————————

[1] The old version of the American Bar Association's Model Rule of Professional Conduct 3.5 prohibited a lawyer "appearing in his professional capacity before a tribunal" from "engag[ing] in undignified or discourteous conduct which is degrading to a tribunal." The ABA subsequently changed this Rule to provide that a lawyer shall not "engage in conduct intended to disrupt a tribunal." Of the forty-five jurisdictions that base their rules on the ABA Rules, only three others besides Michigan retain a reference to "undignified or discourteous conduct," and each of those three includes a further requirement that the conduct be "degrading" or "disrupting" to the tribunal. *See Grievance Adm'r v. Fieger*, ADB #01-055-GA at *6-13 (2004) (surveying other jurisdictions and concluding that Michigan's Rule 3.5(c) "appears to be unique" in its breadth).

## I. The Challenged Rules

I begin with a brief discussion of the Rules in question, since their reach is relevant to plaintiffs' standing to challenge them. The majority repeatedly emphasizes the importance of "the narrow construction" given to the challenged Rules by the Michigan Supreme Court. This "narrow construction" purportedly undermines plaintiffs' ability to establish standing because plaintiffs have not alleged that they "intend to make vulgar, crude, or personally abusive remarks about participants in pending cases." *Supra* at 13; *see also id.* (noting that "the narrow construction placed on" the Rules is the backdrop against which the standing analysis is undertaken).

I find it impossible to read the Michigan Supreme Court's construction of the Rules as "narrow" in any significant way. The majority appears to read the opinion to say that the Rules apply *only* to vulgar, crude, or personally abusive remarks. If that were so, this would be a different case. But the Michigan Supreme Court merely said that the Rules clearly apply to such remarks, without suggesting that they do not apply elsewhere. In its discussion of vagueness, the Court avoided clarifying the Rules' potential reach, noting that Fieger's vagueness challenge "cannot be successfully advanced here because there is no question that even the most casual reading of these rules would put a person clearly on notice that the kind of language used by Mr. Fieger would violate MRPC 3.5(c) and MRPC 6.5(a)." *Grievance Adm'r v. Fieger*, 719 N.W.2d 123, 139 (Mich. 2006). In addition to missing the very point of a vagueness challenge, this passage is indicative of the lack of any narrowing construction in the opinion — the Court says that the Rules clearly apply to certain speech, without suggesting any other speech to which they do not apply. To be sure, the Court emphasizes that the Rules do not prohibit all criticism of judges, instead governing only "the form and manner of such criticism." *Id.* at 144. But that merely raises the question of what forms and manners of criticism are considered "undignified," "discourteous," or lacking in "respect." Comparing judges to Hitler and Goebbels evidently falls on the wrong side of the line. But would it be permissible to vary the "form and manner" of

criticism, and say that the judges had "behaved dictatorially"? Saying that a judge is a "jackass" appears to be impermissible (despite the fact that the word is a non-vulgar name for a donkey). But would it be permissible to vary the "form and manner" and say that he is a "stubborn idiot," a "right-wing radical," a "doctrinaire ideologue," or "driven by party politics"? Or, for that matter, to say that he is an incompetent jurist whose presence on the bench is a disgrace? Nothing in the opinion suggests where the line between permissible and impermissible form might lie. In sum, the Michigan Supreme Court says that lawyers are free to criticize judges, but may only do so in a manner that shows courtesy and respect. The vagueness — and potential reach — of this requirement hardly needs further elaboration.

Not only did the Michigan Supreme Court fail to give the Rules a meaningful limiting construction, it actually expanded the reach of the Rules in several key respects. First, it held that the phrase "all persons involved in the legal process," as used in Rule 6.5(a), includes judges, who therefore must be "treat[ed] with courtesy and respect." If there was any meaningful difference between a prohibition against "undignified or discourteous conduct," on the one hand (which arguably left some leeway for vigorous criticism), and an affirmative duty to treat judges with "courtesy and respect," on the other (which seemingly leaves no such room for criticism), that difference has been made moot, since both provisions now govern attorney conduct toward judges. Second, the Court construed the phrase "toward the tribunal," as used in Rule 3.5(c), to include any statement made "with respect to" the tribunal. *See id.* at 137. This expansive reading of the Rule, which had never previously been applied to an attorney's public comments, *see Grievance Adm'r v. Fieger*, ADB #01-055-GA (2004), means that any public criticism of judges is now potentially subject to disciplinary action. Finally, in its discussion of the Rules' inevitably "flexible" enforcement standards, *see Grievance Adm'r*, 719 N.W.2d at 255, the Court notes that the State's interest in limiting attorney speech is greater when cases are pending. From there, it adopts a technical definition of the word "pending" to conclude that the State has a strong interest in vigorous enforcement even after an appellate court has rendered its judgment, so long as the "time for filing an application for leave to appeal to the Supreme Court," which is now twenty-

one days, has not expired. *Id.* at 135-36. Thus, an attorney's criticism of a recently rendered appellate court decision is treated identically to an attorney's criticism of the court in an ongoing jury trial.[2] This reasoning takes us far afield of the purpose of the rule regarding pending cases, which is concerned with preventing unfairness to the parties and disruption of the legal system. *See, e.g.*, Terri R. Day, *Speak No Evil: Legal Ethics v. The First Amendment*, 32 J. LEGAL PROF. 161 (2008) (explaining that the "Supreme Court has held that attorneys' First Amendment rights must be balanced against litigants' right to fair and impartial adjudications").[3]

In sum, the Michigan Supreme Court's construction of the challenged Rules cannot accurately be described as "narrow." The Court not only failed to limit or clarify the language in any meaningful way, it held that the Rules apply in ways that they had never done before, paving the way for more expansive enforcement in the future. It is against this backdrop that plaintiffs' standing should be evaluated.[4]

## II. Standing

Standing to bring suit under the Declaratory Judgment Act is subject to different requirements than standing to sue for damages or an injunction. The majority blurs these requirements by demanding that plaintiffs demonstrate a pattern of disciplinary actions so consistent that we can infer inevitable and imminent future harm. While this standard

---

[2]The Court does not even stop there. It says that the Rules apply to all pending cases (giving that term an expansive reading, as noted), but declines to say that Rules do not apply to non-pending cases. *See Grievance Adm'r*, 719 N.W.2d at 136 ("It is also unnecessary for us to decide, and we do not decide here, the limits our civility rules place on lawyers after a case has been completed.").

[3]As noted, *supra* note 1, it is instructive to compare Michigan Rule of Professional Conduct 3.5, prohibiting "undignified or discourteous conduct toward the tribunal," with the American Bar Association's Model Rule of Professional Conduct 3.5, which prohibits "conduct intended to disrupt a tribunal." As commentators have noted, "[i]f a lawyer takes action outside a courtroom setting, it is virtually impossible to 'disrupt' a tribunal." GEOFFREY C. HAZARD, JR., ET AL., THE LAW OF LAWYERING § 31.6, 31-8 (3d ed. 2004). Thus, Michigan appears to be unique in saying that its rules concerning attorney speech towards a tribunal apply outside of the courtroom.

[4]I also note in passing that this case presents an unusual concentration of power in one branch of government: the Michigan Supreme Court in effect makes, enforces, and interprets the laws relating to the criticism of its members. Basic separation-of-powers principles and common sense should cause us to approach such laws with a healthy degree of skepticism.

might be appropriate to a suit for injunctive relief, it is inappropriate to a suit for declaratory relief.

In *MedImmune, Inc. v. Genentech, Inc.,* the Supreme Court explained that, when analyzing standing in declaratory-judgment actions, "'the question in each case is whether the facts alleged, under all circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" 549 U.S. at 127 (quoting *Maryland Casualty Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 273 (1941)). There seems to me to be little question that the free-speech controversy here (which requires a straightforward assessment of the Rules' facial validity) is substantial, definite, and concrete, and that the parties have adverse legal interests. The only point of debate, then, concerns whether the controversy is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment. It bears emphasis that this test does not require plaintiffs to violate the law and await actual prosecution: "[W]here threatened action by *government* is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat — for example, the constitutionality of a law threatened to be enforced. The plaintiff's own action (or inaction) in failing to violate the law eliminates the imminent threat of prosecution, but nonetheless does not eliminate Article III jurisdiction." *Id.* at 772.[5]  A controversy possesses sufficient immediacy and reality if a plaintiff faces "a realistic danger" or "credible threat" of the law being enforced against him. *See Babbit v. United Farm*

---

[5]The Court in *MedImmune* drew on *Steffel v. Thompson*, 415 U.S. 452 (1974), a case in which the plaintiff did not have to "proceed to distribute handbills and risk actual prosecution before he could seek a declaratory judgment regarding the constitutionality of a state statute prohibiting such distribution," explaining:

> As then-Justice Rehnquist put it in his concurrence, "the declaratory judgment procedure is an alternative to pursuit of the arguably illegal activity." [*Steffel*, 415 U.S.] at 480. In each of these cases, the plaintiff had eliminated the imminent threat of harm by simply not doing what he claimed the right to do . . . . That did not preclude subject-matter jurisdiction because the threat-eliminating behavior was effectively coerced. *See Terrace* [*v. Thompson*, 263 U.S. 197, 215-16 (1923)]; *Steffel*, [415 U.S.] at 459. The dilemma posed by that coercion — putting the challenger to the choice between abandoning his rights or risking prosecution — is "a dilemma that it was the very purpose of the Declaratory Judgment Act to ameliorate." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 152 (1967).

*MedImmune*, 549 U.S. at 129.

*Workers Nat'l Union*, 442 U.S. 289, 298 (1979). This standard is met "when fear of criminal prosecution under an allegedly unconstitutional statute is not imaginary or wholly speculative" and a plaintiff has asserted that he intends to engage in behavior that appears to be prohibited by the text of a vague law. *Id.* at 303. This is true even where the challenged law has never been applied to the plaintiff and *may not be* in the future. *Id.* at 302. Therefore, a plaintiff has standing to seek declaratory relief when he has alleged an intention to engage in behavior that, if undertaken, would raise a realistic danger of government prosecution.

Fieger has easily satisfied this requirement and thus has standing.[6] He has alleged that he intends to continue being an outspoken critic of the Michigan judiciary. If history is any guide, much of that future criticism could very plausibly be described as "discourteous," putting him in realistic danger of prosecution. The fact that disciplinary action has "only" been brought against him twice does not undermine standing in this context, as the majority contends; it buttresses it.

It is also worth noting that the majority's apparent demand for detailed allegations about the sorts of decisions that Fieger will criticize and the specific language that he will use is particularly inappropriate in a suit for a declaration concerning the *facial* validity of the Rules. If plaintiffs had sought a declaration that certain specific actions could not be punished under the Rules — that is, "a pre-application, as-applied challenge," *Adult Video News Ass'n v. U.S. Dep't of Justice*, 71 F.3d 563, 567 (6th Cir. 1995) (emphasis omitted) — it would be appropriate to require that they allege the behavior with a high degree of specificity and demonstrate the likelihood that they will undertake that behavior in the future. But where they seek a declaration that the law, on its face, is unconstitutionally vague and overbroad, what is the point of having plaintiffs' standing turn on the specificity of their planned conduct? A facial challenge to the Rules will be resolved by reference to the text of the Rules and any limiting constructions Michigan courts have given them; the specific conduct that gave rise to the facial

---

[6]Because Fieger, in my view, has standing, it is unnecessary to address whether Steinberg also has standing.

challenge is of little relevance and should not be determinative of the existence of a case or controversy.

Finally, I do not believe that my colleagues have given sufficient weight to the District Court's conclusions about the existence of a controversy and the appropriateness of issuing declaratory relief. "[T]he existence of an actual controversy and the adequacy of declaratory relief to resolve it are issues often presenting particular difficulty in declaratory judgment actions, and it is to these issues that judicial discretion in such actions is primarily directed." *Perez v. Ledesma*, 401 U.S. 82, 123-24 (1971) (Brennan, J., concurring in part and dissenting in part). As the Court recently reiterated, it is "more consistent with the [Declaratory Judgment Act] . . . to vest district courts with discretion in the first instance, because facts bearing on the usefulness of the declaratory judgment remedy, and the fitness of the case for resolution, are peculiarly within their grasp." *MedImmune*, 549 U.S. at 136 (quotations omitted). The standing question here is not close or subject to reasonable debate among lawyers who understand the law; but if it were, we should give a strong version of deference to the District Court's conclusion that an actual controversy fit for judicial resolution exists.